**Robert L. VERNON, Plaintiff–Appellant,**

v.

**CITY OF LOS ANGELES; Los Angeles City Council; Board of Police Commissioners of the City of Los Angeles; Zev Yaroslavsky, individually and as Los Angeles City Councilman; Stanley Sheinbaum, individually and as Commissioner Board of Police Commissioners; Jesse Brewer, et al., Defendants–Appellees.**

No. 92–55473.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1993.

Decided June 23, 1994.

William Bently Ball, Elizabeth B. Place, Ball, Skelly, Murren & Cornell, Harrisburg, PA, David L. Casterline, Casterline & Agajanian, Los Angeles, CA, for plaintiff-appellant.

Louis R. Miller, Shari J. Cohen, Christensen, White, Miller, Fink & Jacobs, Los Angeles, CA, for defendants-appellees.

Before: FLETCHER and D.W. NELSON, Circuit Judges, and WILL[*], Senior District Judge.

Opinion by Judge WILL.

WILL, Senior District Judge:

Plaintiff Robert L. Vernon, retired Assistant Chief of the Los Angeles Police Department, appeals from the district court's grant of summary judgment in favor of the City of Los Angeles, the Los Angeles City Council, and the Board of Police Commissioners and its finding that the individual defendants were entitled to immunity as to their actions. Vernon brought an action under 42 U.S.C. § 1983, alleging that certain City of Los Angeles officials violated his United States First and Fourteenth Amendment and California state constitutional rights in connection with their investigation of whether his religious views were having an impermissible effect on his on-duty police department performance.

The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367(a). We have jurisdiction over this timely appeal from the final decision of the district court pursuant to 28 U.S.C. § 1291. We affirm the grant of summary judgment in favor of the defendants on the plaintiff's state constitutional claims and Free Exercise Clause and Establishment Clause claims. Because we conclude that

Vernon's state and federal constitutional rights were not violated, we do not address the district court's findings that the individual defendants were entitled to legislative and qualified immunity. We deny the defendants' request for attorneys' fees under 42 U.S.C. § 1988.

## I.

### FACTUAL BACKGROUND

Plaintiff Robert L. Vernon was the Assistant Chief of Police of the Los Angeles Police Department (the "LAPD") at the time of the commencement of this action. As the Director of the LAPD Office of Operations, he had charge of eighty-five percent of operations for the approximately 8,400–member LAPD police force. He commanded all patrol units and most detectives. In 1980, he was appointed by the California governor as a Commissioner of the Peace Officer Standards and Training Commission. Since 1984, he has served as an elder of the Grace Community Church (the "Church"), in Sun Valley, California.

On May 5, 1991, an article appearing in the Los Angeles Magazine critically commented on Vernon's involvement in the Church. Specifically, the article quoted from a series of audiotapes made by Vernon for the Church approximately fifteen years earlier. According to the article, Vernon "condemns homosexuality, depicts cops as 'ministers of God,' instructs churchgoers that 'the woman is to be submissive to the man' and adjures men to 'recognize the concept of disciplining followers, whether it be your son, employees or anyone under your control—your wife.'" *The Dan Quayle Principle Strikes Again,* Los Angeles Magazine, May 21, 1991, at 28, Pl.'s Decl.Supp.Mot.Prelim.Inj., Ex. 1. Vernon claims that the article greatly misrepresented his sincerely-held religious beliefs.

Defendant Zev Yaroslavsky is one of several City Councilmen having oversight responsibility for the LAPD. On May 22, 1991, at a City Council meeting to confirm Michael

---

[*] Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

Yamaki as a Police Commissioner, Yaroslavsky confronted Yamaki with the Los Angeles Magazine article and solicited his agreement, upon his confirmation, to inquire into whether Vernon's religious beliefs improperly affected the operations of the LAPD.

Defendant Stanley Sheinbaum is a Police Commissioner of the City of Los Angeles. On May 25, 1991, Sheinbaum questioned publicly whether Vernon still held the religious views attributed to him and if so, whether they were having an impermissible effect on his on-duty performance in the LAPD.

Yaroslavsky had allegedly uncovered evidence which suggested that: (1) Vernon had justified a secret, unauthorized investigation into Chief of Police Daryl Gates' off-duty activities by proclaiming that "God wants me to be chief"; (2) Vernon gave unfair advantages in hiring and promotion decisions to fellow Church members within the LAPD by manipulating LAPD test scores; (3) Vernon was known throughout the LAPD as a "bible thumper" and as head of the LAPD "God squad"; (4) Vernon was influenced by his religious views in ordering no arrests at anti-abortion demonstrations, and in attempting to thwart the progress of homosexual and female officers within the LAPD; (5) Vernon had pressured LAPD officers to attend religious meetings at the Church and at LAPD headquarters; and (6) Vernon had used religious symbols, such as fish, in official LAPD correspondence. Based on this evidence, on June 3, 1991, Yaroslavsky sent a letter to defendant Melanie Lomax, acting President of the Board of Police Commissioners (the "Board"), requesting that an investigation be conducted to determine whether any of the alleged improprieties had in fact occurred.

In pertinent part, the letter stated:

As you are aware, questions have arisen recently about whether the views of Assistant Police Chief Robert L. Vernon may be improperly shaping the operations and policies of the Los Angeles Police Department. During his confirmation hearing, Commissioner Yamaki indicated a willingness to conduct an investigation of this matter. I am writing today to confirm my interest in such a review.

Chief Vernon is, of course, entitled to his personal religious and political views. I vigorously defend his right to his views. However, when one's views interfere with one's ability to perform official duties fairly and without bias, it is no longer a personal matter, but a matter of public policy.

Allegations concerning promotion, hiring and treatment of gays and lesbians, and, most recently, the consultation of religious elders on issues of public policy, deserve to be reviewed. If the allegations have merit, then they should be addressed and the problems corrected. If they are without merit, then they should be laid to rest at once. It is critical that this issue be dealt with thoroughly and expeditiously.

Letter from Yaroslavsky to Lomax of 6/3/91, Decls., Ex. C at 45. Yaroslavsky released the letter to the press on the same day. Vernon immediately reacted to the publicity by stating on KNBC–TV that "[i]nvestigating me because of my beliefs is against the law. It's against my rights as an individual." Br. of Appellant at 10.

On June 4, 1991, on Sheinbaum's motion, the Board voted unanimously to request that Chief of Police Daryl Gates initiate an investigation into these allegations. Later that day, Sheinbaum and Lomax made public statements concerning the investigation. For example, Sheinbaum stated that "the views of the assistant Chief are his own. He has every right to them. What bothers me . . . is that some allegations do claim it has impacted on his role as Assistant Police Chief. That's going to be up to Chief Gates to determine." Excerpt of Regular Board Mtg. on 6/4/91, Sheinbaum Decl., Ex. C at 9. On June 5, 1991, Lomax sent an official request to Chief Gates on behalf of the Board, which called for an investigation.

In pertinent part, the memorandum stated:

The Board of Police Commissioners requests that an investigation be conducted into certain issues raised by Councilman Yaroslavsky concerning the on-duty activities of Assistant Chief Robert L. Vernon.

The investigation should include a determination in the areas of the promotions, hiring and treatment of gays, lesbians and

women, and the consultation of religious elders on matters of police policy.

It is respectfully requested that findings be made as to whether Chief Vernon has sent official communications from this office which contain or have displayed religious symbols. It is also specifically requested that a determination be made as to whether employees who have been promoted by Chief Vernon have received preferential treatment through their affiliations with his church. This determination is to include both sworn and civil personnel.

It should be clear from the outset that it is not the intention of this Board to abridge the First Amendment rights of Chief Vernon or anyone else, as each member of this Commission would vigorously protect and defend those rights. The Board wishes only to ensure that Chief Vernon's personal beliefs have not created any adverse impact on any job-related matters and that he has not violated any Department policies or procedures. It is toward this end that a thorough investigation is requested.

It is requested that a progress report be presented in Closed Session on June 25, 1991, and that a final report be completed as early in July, 1991, as possible.

Memorandum from Lomax to Chief of Police of 6/5/91, Lomax Decl., Ex.C. The request was sent to Gates pursuant to a Board policy requiring that complaints from the general public or elsewhere alleging police misconduct be referred to the Chief of Police for investigation.

Shortly following his receipt of Lomax's memorandum, Chief Gates began the investigation of Vernon in accordance with the policies established by the Board and the LAPD. According to Chief Gates, the investigation focused entirely on Vernon's on-duty conduct. Apparently, no specific inquiry was made into Vernon's religious beliefs. In the five months during which the investigation took place, the contents of the request for investigation were disclosed to neither Vernon nor the public. On November 26, 1991, Chief Gates formally reported to the Board that none of the allegations concerning Vernon's on-duty conduct could be substantiated. Accordingly, the investigation was terminated and the Board took no further action with respect to the allegations concerning the plaintiff.

## II.

### PROCEDURAL BACKGROUND

Plaintiff filed a § 1983 action against the City of Los Angeles, the City Council, the Board, Yaroslavsky, Sheinbaum, Brewer, and Lomax on November 4, 1991. In his complaint, Vernon alleged that the pre-investigation activities and the investigation itself violated his federal constitutional rights under the Free Exercise and Establishment Clauses of the First Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. He also alleged similar violations of his religious rights under Article 1 of the California Constitution.

Between May 5, 1991 and the time the complaint was filed, approximately 33 articles concerning the investigation of Vernon appeared in newspapers and journals. Vernon contends that the defendants' actions have caused him to suffer extreme embarrassment, anxiety, and fear in the pursuit of his religious, personal, and professional affairs. He further claims that their actions have retarded him in the exercise of his religious beliefs, including worship, consultation with his pastor, participation in Christian fellowship, and giving public testimony to his faith without severe consequences. He also alleges damage to his personal and professional reputation. For example, he was not reappointed to the Peace Officer Standards and Training Commission, on which he had previously served for many years.

On December 17, 1991, the district court denied Vernon's motion for a preliminary injunction. On April 8, 1992, the district court issued its Second Amended Order, which granted the defendants' motion for summary judgment in its entirety. In its opinion, the district court dismissed the action against Yaroslavsky on the grounds of absolute legislative immunity and as to Brewer on the grounds that his alleged conduct did not rise to the level of a constitutional

violation. With respect to the free exercise claims, the district court dismissed the action as to all defendants, finding that Vernon failed either to allege or to prove a constitutionally cognizable injury. With respect to the establishment claims, the court similarly dismissed the action, finding no triable issue of material fact and concluding that the investigation and related activity passed the *Lemon* test and that the City's actions were justified by the City's compelling state interest and were properly narrowly tailored to serve that interest. The court also dismissed the Equal Protection and Due Process Clause claims. Concluding that the analysis of the plaintiff's claim under Article I, Section 4 of the California Constitution would not differ from that of the Free Exercise Clause and Establishment Clause claims under the federal constitution, the district court found it unnecessary to address separately Vernon's state constitutional rights.

On appeal, Vernon challenges the district court's rulings regarding his state constitutional claims, his Free Exercise Clause claim, his Establishment Clause claim, absolute legislative immunity, and qualified immunity.

## III.

## DISCUSSION

### A. *Standard of Review*

This Court reviews *de novo* a grant of summary judgment, and may affirm on any ground supported by the record. *Jones v. Union Pac. R.R.,* 968 F.2d 937, 940 (9th Cir.1992); *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1112 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where, viewing the evidence in the light most favorable to the non-moving party, no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*

475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). *See also Valladolid v. City of National City,* 976 F.2d 1293, 1295 (9th Cir.1992); *Grimes v. City and County of San Francisco,* 951 F.2d 236, 239 (9th Cir. 1991).

A district court's interpretation of state constitutional law is reviewed *de novo* by this court. *Hewitt v. Joyner,* 940 F.2d 1561, 1565 (9th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). As this court has previously noted, a federal court interpreting state law is bound by the decisions of the highest state court. *Id.; In re Kirkland,* 915 F.2d 1236, 1238 (9th Cir.1990) (citing *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1482 (9th Cir.1986), *reh'g denied, op. modified,* 810 F.2d 1517 (9th Cir. 1987)). Moreover, federal courts are not precluded from affording relief simply because neither the state supreme court nor the state legislature has enunciated a clear rule governing a particular type of controversy or claim. *Hewitt,* 940 F.2d at 1565; *Paul v. Watchtower Bible and Tract Soc'y of New York,* 819 F.2d 875, 879 (9th Cir.), *cert. denied,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). Where the state supreme court has not spoken on an issue presented to a federal court, the federal court must determine what result the state supreme court would reach based on state appellate court opinions, statutes, and treatises. *Hewitt,* 940 F.2d at 1565; *Kirkland,* 915 F.2d at 1239; *Molsbergen v. United States,* 757 F.2d 1016, 1020 (9th Cir.), *cert. denied,* 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).

Accordingly, we must determine, viewing the evidence in the light most favorable to Vernon, (1) whether there exist any genuine issues of material fact and (2) whether the district court properly applied the relevant substantive law to Vernon's claims. *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 584 (9th Cir.1993).

### B. *Vernon's Claims Under the California Constitution*

It is well-established that we should avoid adjudication of federal constitutional claims when alternative state grounds are

available. *Hewitt v. Joyner,* 940 F.2d 1561, 1565 (9th Cir.1991) (citing *Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 193, 29 S.Ct. 451, 455–56, 53 L.Ed. 753 (1909)), *cert. denied,* —— U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042–43 (9th Cir.1985). Where the state constitutional provisions are co-extensive with related federal constitutional provisions, we may decide the federal constitutional claims because that analysis will also decide the state constitutional claims. *Los Angeles County Bar Ass'n v. Eu,* 979 F.2d 697, 705 n. 4 (9th Cir.1992). However, where the state provisions offer more expansive protection than the federal constitution, we must address the state constitutional claims in order to avoid unnecessary consideration of the federal constitutional claims. *Ellis v. City of La Mesa,* 990 F.2d 1518, 1524 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994); *Hewitt,* 940 F.2d at 1565.

The district court correctly noted that "[o]wing to the highly unusual facts of this case, there appear to be no directly applicable cases—either state or federal—for the Court to rely upon...." Second Am. Order Granting Def.'s Mot. for Summ.J. at 2 n. 1. Therefore, in considering both the state and federal claims raised by the plaintiff, the district court applied "general principles common to both federal and California constitutional doctrine" relating to the Free Exercise and Establishment Clauses. *Id.* As noted above, the district court concluded that the plaintiff's state constitutional rights in this case were essentially co-extensive with his federal rights and thus did not require separate consideration. While we ultimately agree with the district court that the outcome in this case is the same under both state and federal constitutional law, state law sometimes requires a different analysis and we will address these differences in our ensuing discussion of Vernon's state and federal claims.

### C. *Free Exercise of Religion*

Article I, Section 4 of the California Constitution provides in pertinent part that "[f]ree exercise and enjoyment of religion ...

are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State." Cal. Const. Art. I, § 4. The First Amendment of the United States Constitution protects the "free exercise" of religion. U.S. Const.Amend. I. California case law suggests that analysis of a claim of the constitutional right to the free exercise of religion is generally similar under both federal and state constitutional law. *Molko v. Holy Spirit Ass'n,* 46 Cal.3d 1092, 252 Cal.Rptr. 122, 132–33, 762 P.2d 46, 56–57 (1988), *cert. denied,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989). In fact, the California Supreme Court has specifically adopted the federal test enunciated by the Supreme Court in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 71–72, 394 P.2d 813, 815–16 (1964). *See also Walker v. Superior Court,* 47 Cal.3d 112, 253 Cal.Rptr. 1, 18–20, 763 P.2d 852, 869–71 (1988) (applying federal balancing test and compelling state interest analysis as a matter of state constitutional law), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989); *Molko,* 46 Cal.3d 1092, 252 Cal.Rptr. at 133, 762 P.2d at 57 (same); *In re Arias,* 42 Cal.3d 667, 230 Cal.Rptr. 505, 520, 725 P.2d 664, 679 (1986) (same).

■ In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court articulated the balancing test that has traditionally been utilized to analyze claims brought under the Free Exercise Clause. Under this test, government actions that substantially burden a religious practice must be justified by a compelling state interest and must be narrowly tailored to achieve that interest. *Id.* at 403, 83 S.Ct. at 1793; *Thomas v. Review Bd., Indiana Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). According to the California Supreme Court, the *Sherbert* twofold analysis "calls for a determination of, first, whether the application of the statute imposes any burden upon the free exercise of the defendant's religion, and second, if it does, whether some compelling state interest justifies the infringement." *Woody,* 61 Cal.2d 716, 40 Cal.Rptr. at 72, 394 P.2d at 816 (footnote omitted). A govern-

ment action which passes the balancing test "must also meet the further requirements that (1) no action imposing a lesser burden on religion would satisfy the government's interest and (2) the action does not discriminate between religions, or between religion and nonreligion." *Molko,* 46 Cal.3d 1092, 252 Cal.Rptr. at 133, 762 P.2d at 57 (citing *Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961)).[1]

Under *Sherbert,* the plaintiff must first establish that the government has placed a substantial burden on his or her free exercise of religion. A substantial burden exists

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Thomas,* 450 U.S. at 717–18, 101 S.Ct. at 1432. *See also Smith,* 494 U.S. at 897, 110 S.Ct. at 1610 (O'Connor, J., concurring); *Frazee v. Illinois Dept. of Employment Sec.,* 489 U.S. 829, 832, 109 S.Ct. 1514, 1516–17, 103 L.Ed.2d 914 (1989); *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987).

The free exercise provision of the California Constitution also requires that plaintiffs demonstrate a burden upon their exercise of religion. The California Supreme Court has held that "[t]he first step requires an exploration into the particulars of this case to determine whether [the government action] imposes any burden upon the free exercise of ... religion." *Woody,* 61 Cal.2d 716, 40 Cal. Rptr. at 72, 394 P.2d at 816. Relying principally on federal precedent, California courts have consistently required plaintiffs to show a significant burden upon the exercise of religious rights. *See, e.g., Molko,* 46 Cal.3d 1092, 252 Cal.Rptr. at 135–136, 762 P.2d at 59–60 (finding that tort liability for deceptive recruitment practices imposes marginal burden on church's free exercise of religion); *Arias,* 42 Cal.3d 667, 230 Cal.Rptr. at 512–13, 725 P.2d at 681–82 (finding that use of a chapel microphone and monitoring system at Youth Authority school substantially burdens wards' exercise of religion); *Woody,* 61 Cal.2d 716, 40 Cal.Rptr. at 74, 394 P.2d at 818 (finding that statutory prohibition of peyote places substantial burden on religious practice because it results in a virtual inhibition of the practice of religion).

■ The district court denied Vernon's free exercise claims because it determined that he failed to meet the threshold test of establishing that his right freely to exercise his religion was substantially burdened by the government's action in this case. We agree that Vernon has failed to demonstrate a substantial burden. As this Court has previously stated,

> [t]o show a free exercise violation, the religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.

*Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987) (internal citations omitted), *aff'd sub nom., Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1988). *See also United States v. Turnbull,* 888 F.2d 636, 638–39 (9th Cir.

---

1. Vernon argues that this case is governed by the analysis set forth in *Employment Div. Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). We reject this claim because this Circuit has held that the *Smith* analysis is inapplicable to Free Exercise claims such as the plaintiff's. *See NLRB v. Hanna Boys Ctr.,* 940 F.2d 1295, 1305 (9th Cir.1991),

*cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Moreover, Congress recently restored the application of the compelling interest standard of *Sherbert* for all cases in which the free exercise of religion is substantially burdened. *See* Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb *et seq.* (1993).

**1394**

1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990).

Applying this test, the district court found that "[i]t is thus inadequate for a plaintiff merely to allege that government action subjectively 'chills' his religious behavior, especially where the government action is neither regulatory, proscriptive, or compulsory in nature." Second Am. Order Granting Defs.' Mot.Summ.J. at 11. The district court relied upon *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972), and *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 522 (9th Cir.1989), to support its conclusion, and we find its application of these precedents to be correct.

In *Laird,* the plaintiffs challenged the Army's domestic surveillance of peaceful civilian activity, alleging a "chilling" effect on the exercise of their First Amendment rights caused not by any specific action of the Army directed against the plaintiffs, but only by the mere existence and operation of the surveillance program in general. 408 U.S. at 3, 92 S.Ct. at 2320. The Supreme Court held that the plaintiffs lacked standing to challenge government action under the First Amendment because they had failed to set forth "a claim of specific present objective harm or a threat of specific future harm." *Id.* at 14, 92 S.Ct. at 2326. While the Court acknowledged that constitutional violations may arise from the deterrent or "chilling" effect of government regulations that fall short of a direct prohibition against the exercise of First Amendment rights, it found that in those cases "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id.* at 11, 92 S.Ct. at 2324.

In *Presbyterian Church,* the plaintiff churches brought an action against the Immigration and Naturalization Service ("INS") for violation of their First Amendment rights when INS agents surreptitiously recorded church services. Specifically, the churches alleged that as a result of the surveillance activities, members had withdrawn from active church participation, bible study groups were cancelled, church support declined, and congregants had become reluctant to seek counseling and were less open in prayers. 870 F.2d at 521–22. In holding that the churches had standing to bring their claims, this Court distinguished their "chilling effect" injury from that in *Laird:*

> *Laird* does not control this case. The churches in this case are not claiming simply that the INS surveillance has "chilled" them from holding worship services. Rather, they claim that INS surveillance has chilled *individual congregants* from attending worship services, and that this effect on the congregants has in turn interfered with the churches' ability to carry out their ministries. The alleged effect on the *churches* is not a mere subjective chill on their worship activities; it is a concrete, demonstrable decrease in attendance at those worship activities.

*Id.* at 522 (emphasis in original). Although *Presbyterian Church* addressed the injury necessary to establish standing rather than constitutional injury and involved a church rather than an individual plaintiff, its distinction between mere subjective chill and concretely demonstrable injury is relevant to the analysis of this case.

In his Complaint, Vernon alleges that the investigation has "chilled [him] in the exercise of his religious beliefs, fearing that he can no longer worship as he chooses, consult with his ministers and the elders of his church, participate in Christian fellowship and give public testimony to his faith without severe consequences...." Compl. at 19. While Vernon testified that the investigation has interfered with neither his "relationship ... [and] ability to communicate with God" nor his relationship with his pastor, he has alleged that "it has interfered with [his] freedom to worship in the way [he] want[s] without repercussions...." Vernon Dep. of 12/20/91, Vernon Decl., Ex. 1 at 98. Like the plaintiffs in *Laird,* Vernon has failed to offer any evidence either to prove these allegations or to demonstrate that concrete harm has resulted from the investigation. There is simply no evidence that the City ever monitored Vernon's private religious activities.

It is clear from the record that the investigation was restricted in its scope to consideration only of Vernon's on-duty activities and that it resulted in no disciplinary action being taken against Vernon. Gates Decl. at 3, ¶ 10. Thus, unlike the plaintiff churches in *Presbyterian Church*, Vernon has failed to show any concrete and demonstrable injury. While Vernon believes that it has been "implied" that he cannot consult with his church elders, he admits in his deposition testimony that no one has specifically told him that he cannot do so. Vernon Decl., Ex. 1 at 138–39. Rather, he argues that the investigation itself constitutes a statement to that effect. *Id.* at 138. In short, Vernon alleges that his "precious right to pursue [his] personal religion has been ... deprived and ... chilled." *Id.*

Application of *Laird* is conclusive in this case. Vernon complains that the existence of a government investigation has discouraged him from pursuing his personal religious beliefs and practices—in other words, mere subjective chilling effects with neither "a claim of specific present objective harm [n]or a threat of specific future harm." *Laird*, 408 U.S. at 14, 92 S.Ct. at 2326. Such chilling effects are simply not objectively discernable and are therefore not constitutionally cognizable under *Laird*.

The district court correctly applied *Laird* and *Presbyterian Church* to determine that no substantial burden was demonstrated. To the extent that certain of Vernon's religious practices—namely, his consultation with church elders and his proselytism—were burdened at all, such burdens cannot be said to be "substantial." *Turnbull*, 888 F.2d at 639. Accordingly, we find that the district court did not err in determining that the plaintiff failed to establish a substantial burden. Because Vernon has failed to prove that the City's investigation substantially burdened his religious rights, we need not proceed further with the *Sherbert* analysis.

### D. *Establishment of Religion*

The United States Constitution prohibits any law "respecting an establishment of religion." U.S. Const.Amend. I. In language virtually identical to the Establishment Clause of the First Amendment, the California Constitution states that "[t]he Legislature shall make no law respecting an establishment of religion." Cal.Const. Art. I, § 4. It is clear that the provisions of the California Constitution are not dependent upon the federal constitution for their meaning. Cal. Const. Art. I, § 24 ("Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."). However, the California Supreme Court has suggested that decisions of the United States Supreme Court, although not binding on questions of state constitutional law, are nonetheless entitled to some degree of deference, especially when they address similar provisions. *See Raven v. Deukmejian*, 52 Cal.3d 336, 276 Cal.Rptr. 326, 337, 801 P.2d 1077, 1088 (1990) ("'cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution.'") (quoting *Gabrielli v. Knickerbocker*, 12 Cal.2d 85, 82 P.2d 391, 393 (1938)).

In language having no counterpart in the federal constitution, Article I, Section 4 of the California Constitution also guarantees the "[f]ree exercise and enjoyment of religion *without discrimination or preference....*" Cal. Const. Art. I, § 4 (emphasis added). This Court has previously observed that while Article I of the California Constitution contains language quite similar to the religion clauses of the First Amendment, "it also provides that the state may not discriminate between religions or prefer one religion over another." *Hewitt*, 940 F.2d at 1565. We have held that the No Preference Clause prohibits any appearance that the government has allied itself with one specific religion. *Ellis*, 990 F.2d at 1524; *Hewitt*, 940 F.2d at 1566–67.

The No Preference Clause of the California Constitution has been interpreted by California state courts as being broader than the Establishment Clause of the First Amendment. *Okrand v. City of Los Angeles*, 207 Cal.App.3d 566, 254 Cal.Rptr. 913, 916 (1989) ("'California's constitutional provisions are more comprehensive than those of the federal Constitution.'") (citations omitted); *Fox v.*

*City of Los Angeles,* 22 Cal.3d 792, 150 Cal. Rptr. 867, 869, 587 P.2d 663, 665 (1978) ("Preference thus is forbidden even when there is no discrimination. The current interpretations of the United States Constitution may not be that comprehensive."). In fact, a plurality of the California Supreme Court has noted that:

> The Attorney General of this state has observed that "[i]t would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion" than that found in the "no preference" clause, and California courts have interpreted the clause as being more protective of the principle of separation than the federal guarantee.

*Sands v. Morongo Unified Sch. Dist.,* 53 Cal.3d 863, 281 Cal.Rptr. 34, 45, 809 P.2d 809, 820 (1991) (en banc) (internal citations and quotations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992). In his concurrence in *Sands,* Justice Mosk described the No Preference Clause in the following way:

> the preference clause seeks to prevent government from giving *any* advantage to religion in California. The relevant inquiry is whether government has granted a benefit to a religion or religion in general that is not granted to society at large. Once government bestows that differential benefit on religion, it has acted unconstitutionally in this state.

*Id.,* 53 Cal.3d 863, 281 Cal.Rptr. at 65, 809 P.2d at 840 (emphasis in original) (footnote omitted). *See also Lucas Valley Homeowners Ass'n v. County of Marin,* 233 Cal. App.3d 130, 284 Cal.Rptr. 427, 435 (1991).

Notwithstanding the clear differences between the state and federal guarantees, California courts have recognized that an analysis of establishment claims under the California Constitution frequently produces the same results as one under the federal constitution. *Okrand,* 207 Cal.App.3d 566, 254 Cal. Rptr. at 916. Noting that California cases addressing establishment claims under the state constitution are few, the *Okrand* court observed that a state court "may 'also consult principles of federal cases as they seem compelling guides to uncharted state grounds.'"

*Id.* (quoting *Feminist Women's Health Ctr., Inc. v. Philibosian,* 157 Cal.App.3d 1076, 203 Cal.Rptr. 918, 923 (1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985)). The *Okrand* court accordingly incorporated into its state law analysis the federal Establishment Clause test, as delineated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Id.,* 53 Cal.3d 863, 281 Cal.Rptr. at 142 at 917.

### 1. The *Lemon v. Kurtzman* Analysis

■■■■ We initially observe that although the federal Establishment Clause cases for the most part have addressed governmental efforts to *benefit* religion or particular religions, it is clear that "the First Amendment forbids an official purpose to *disapprove* of a particular religion or of religion in general." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* —— U.S. ——, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993) (emphasis added). The government neutrality required under the Establishment Clause is thus violated as much by government disapproval of religion as it is by government approval of religion. *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). *See also School Dist. of Abington v. Schempp,* 374 U.S. 203, 215, 83 S.Ct. 1560, 1567–68, 10 L.Ed.2d 844 (1963). It is this mandated neutrality towards religion which Vernon contends was violated by the City's call for an investigation into the potentially improper impact of his religious beliefs upon his job as Assistant Chief of Police.

■■ In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court articulated the test to be applied to governmental actions and laws to determine their constitutionality under the Establishment Clause of the First Amendment. In order to pass constitutional muster, the challenged action must (1) have a secular purpose; (2) have a primary effect which neither advances nor inhibits religion; and (3) not foster excessive state entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111. The Supreme Court has held that the challenged practice must survive all three

prongs of the *Lemon* analysis in order to be held constitutional. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987) ("State action violates the Establishment Clause if it fails to satisfy any of these prongs."). This Circuit has consistently applied this test when examining Establishment Clause claims. *See, e.g., Kreisner v. City of San Diego,* 1 F.3d 775, 781 (9th Cir.1993) ("The challenged practice must survive all three prongs of the *Lemon* analysis in order to pass constitutional muster."), *cert. denied,* —— U.S. ——, 114 S.Ct. 690, 126 L.Ed.2d 657 (1994); *Hanna Boys,* 940 F.2d at 1303 (same).

█ This Circuit has also held that the first prong of the *Lemon* test—whether the government action has a secular purpose—is satisfied if one purpose of the government action is secular. As the majority noted in *Cammack v. Waihee,* 932 F.2d 765 (9th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992), "[w]hen there are both religious and legitimate, sincere secular purposes motivating legislation, it appears that the existence of the secular purpose will satisfy the first *Lemon* prong." *Id.* at 773 (citing *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 1363, 79 L.Ed.2d 604 (1984) and *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985)).

Although it does not change the outcome in this case, we believe that the Supreme Court has articulated a slightly more stringent test, which requires that the "actual" or "primary" purpose of the government action be secular. *See Cammack,* 932 F.2d at 782–83 (D.W. Nelson, J., dissenting) ("I firmly believe that 'primary' or 'actual' [rather than 'a' or 'any'] secular purpose is both the test that the Supreme Court has articulated and a far preferable formulation."). In *Lynch v. Donnelly,* 465 U.S. 668, 690–91, 104 S.Ct. 1355, 1368–69, 79 L.Ed.2d 604 (1984), Justice O'Connor noted in her concurrence that the purpose prong "is not satisfied ... by the mere existence of some secular purpose, however dominated by religious purposes." *See also Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489–90, 86 L.Ed.2d 29 (1985) (noting that a court must look to " 'whether government's actual purpose is to endorse or

disapprove of religion' "); *Edwards,* 482 U.S. at 585, 107 S.Ct. at 2578 (" 'The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion.' ") (quoting *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, concurring)). In any event, we find that the first prong of the *Lemon* test is satisfied.

The district court concluded that the investigation at issue in this case clearly had a valid secular purpose—to determine whether there was any basis to the allegations that Vernon's religious views were affecting his job performance in such a way as to violate either LAPD policies and regulations or the civil and constitutional rights of both police officers and citizens. Most importantly, it is undisputed that the defendants' actions were aimed at determining whether Vernon's alleged on-duty conduct violated the Establishment Clause.

█ It is well-established that governmental actions primarily aimed at avoiding violations of the Establishment Clause have a legitimate secular purpose. *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111. In *Roberts v. Madigan,* 921 F.2d 1047, 1054 (10th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992), the Tenth Circuit recognized that a school's efforts to prevent possible violation of the Establishment Clause by ordering a teacher not to keep his bible on his desk during school hours constituted a valid secular purpose sufficient to satisfy the first prong of the *Lemon* test. In *Bishop v. Aronov,* 926 F.2d 1066, 1077–78 (11th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992), the Eleventh Circuit similarly found that a university's efforts to avoid an establishment of religion violation by ordering a professor to refrain from interjecting religious remarks into his classes constituted a valid secular purpose.

The valid secular purpose of the city's investigation is reflected in four documents. First, the Yaroslavsky letter of June 3, 1991, initially requesting the investigation clearly identifies the purpose of the investigation to be the determination of whether the operations and policies of the LAPD were being

improperly compromised by Vernon.[2] Second, the Lomax memorandum of June 5, 1991, ordering the investigation directed that the purpose of the investigation of Vernon's on-duty conduct was to determine whether any LAPD policies were being violated.[3] Third, at the June 4, 1991 meeting of the Board of Police Commissioners, Sheinbaum similarly emphasized the need to determine whether any LAPD policies or procedures had been violated.[4] Fourth, in his declaration, Chief Gates, who actually conducted the investigation, confirmed that Vernon's potential violation of the LAPD policy prohibiting the establishment of religion was the aim and scope of the investigation.[5]

 Under the second prong of the *Lemon* test, we must consider whether it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion. *County of Allegheny v. ACLU,* 492 U.S. 573, 592–93, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989); *Wallace,* 472 U.S. at 75, 105 S.Ct. at 2499; *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). *See also Cammack,* 932 F.2d at 777–78. We do not believe that the investigation of Vernon sent such a message. As the Supreme Court has observed, "an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the non-adherents as a disapproval, of their individual religious choices." *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). To determine the primary effect of the government action at issue in this case, it is useful to consider the documents released publicly prior to the commencement of the investigation.

The district court found no evidence in the record from which a reasonable person could infer any disapproval by the city government of Vernon's religion. The record is not quite that clear. For example, Yaroslavsky's June 3, 1991 letter, which he released to the press, made specific reference to Vernon's alleged "consultation with religious elders on issues of public policy." Decls., Ex. C at 45. The fact that the city expressly included within the scope of the investigation inquiries concerning "consultation with religious elders on issues of public policy" suggests that the city disapproved of such consultation, possibly due to the particular religious beliefs underlying such consultation.

However, the key consideration in this second prong analysis is whether the government action "primarily" disapproves of religious beliefs. Notwithstanding the fact that one may infer possible city disapproval of Vernon's religious beliefs from the direction of the investigation, this cannot objectively be construed as the primary focus or effect of

---

**2.** In pertinent part, this letter stated:

[Q]uestions have arisen recently about whether the views of Assistant Police Chief Robert L. Vernon may be improperly shaping the operations and policies of the Los Angeles Police Department.... [W]hen one's views interfere with one's ability to perform official duties fairly and without bias, it is ... a matter of public policy.

Decls., Ex. C at 45.

**3.** In pertinent part, the memorandum stated:

The Board wishes only to ensure that Chief Vernon's personal beliefs have not created any adverse impact on any job-related matters and that he has not violated any Department policies or procedures. It is toward this end that a thorough investigation is requested.

Lomax Decl., Ex. C.

**4.** According to the records of this meeting, he stated:

The Police Commission will refer this matter to the Chief of Police with the request that the allegations be investigated with the specific purpose of determining whether or not Assistant Chief Vernon has engaged in any conduct that violates LAPD policies or procedures, or engaged in any conduct that has adversely impacted the Department.

Sheinbaum Decl., Ex. C at 9.

**5.** In pertinent part, he stated:

I received a memorandum from [Lomax] requesting that an investigation be conducted into ... the *on-duty activities* of Assistant Chief Robert Vernon.... The inquiry was limited to the *on-duty activities* of Chief Vernon.... Just as LAPD policy prohibits the establishment or use of religious biases and preferences in the operation of the LAPD, it is also LAPD policy not to infringe on the free expression and religious rights of LAPD personnel.

Gates Decl. at 2–4.

the investigation. The primary purpose of the government action was the investigation of any possible impermissible or illegal on-duty conduct of Vernon. This is supported not only by the express language of the documents requesting and ordering the investigation, but also by the prominent disclaimers contained therein. For example, Yaroslavsky's June 3, 1991 letter stated that "Chief Vernon is, of course, entitled to his personal religious and political views. I vigorously defend his right to his views." *Id.* Also, Lomax's June 5, 1991 memorandum similarly stated, "It should be clear from the outset that it is not the intention of this Board to abridge the First Amendment rights of Chief Vernon or anyone else, as each member of this Commission would vigorously protect and defend those rights." Lomax Decl., Ex. C. And Chief Gates has stated that the investigation was so limited.

Neither the pre-investigation statements nor the investigation itself could reasonably be construed to send as its *primary* message the disapproval of Vernon's religious beliefs; thus, the government action satisfies the second prong of the *Lemon* test.

■ The third prong of the *Lemon* test requires the court to examine whether the government action results in " 'an excessive government entanglement with religion.' " *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111. As this Court has previously noted, "[t]he entanglement prong seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs." *Cammack,* 932 F.2d at 780. We find that this prong has been satisfied. In *Lemon,* the Supreme Court was concerned with administrative and political entanglement. Vernon argues that the city's actions in this case constituted both administrative and political entanglement.

■ Administrative entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion. *Lemon,* 403 U.S. at 619–22, 91 S.Ct. at 2114–15; *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365. *See also Cammack,* 932 F.2d at 781. The *Lemon* Court articulated three factors to be weighed in determining this type of excessive entanglement: first, the character and purpose of the religious institution affected by the government action; second, the nature of the activity that the government mandates; and third, the resulting relationship between the government and the religious institution. *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112. *See, e.g., Jimmy Swaggart Ministries v. Board of Equalization,* 493 U.S. 378, 393, 110 S.Ct. 688, 697, 107 L.Ed.2d 796 (1990). The Ninth Circuit has adopted this analysis. *See, e.g., Hanna Boys,* 940 F.2d at 1303, 1304–05; *EEOC v. Fremont Christian School,* 781 F.2d 1362, 1369 (9th Cir.1986); *EEOC v. Pacific Press Publishing Ass'n,* 676 F.2d 1272, 1282 (9th Cir.1982).

Turning to the first factor, although the plaintiff fails to present a clear argument on this point, he appears to suggest that at least two institutions are potentially affected by the government's investigation in this case. First, he claims that his church—the Grace Community Church—is affected by the negative publicity surrounding the investigation. Second, he suggests that all other religious institutions are potentially affected by the risk that such an investigation will be launched against them. The character and purpose of these institutions is clearly religious in nature. It must be noted, however, that the government's investigation was not directed at the Church; instead, even drawing all reasonable inferences in Vernon's favor, the government investigation at most only collaterally affected the Church through its inquiry whether Vernon consulted with church elders on matters of police policy.

With respect to the second factor, the nature of the activity mandated by the government—namely, investigation of the impact of religious beliefs on Vernon's on-duty job performance—cannot easily be separated from the religious mission of the institutions identified above as being affected by the government action in this case. Significantly, the observance of religious practices and veneration of religious beliefs constitute the central goal of these institutions. The government's action is thus closely connected to the institutions' religious charge.

However, consideration of the third factor—the resulting relationship between the

government and the religious institutions—establishes that the government action in this case does not constitute administrative entanglement. There is simply no continuing or systematic investigation of religious beliefs in this case. In fact, as noted above, several specific precautions were taken by the defendants to limit the scope and duration of the investigation. For example, in his June 3, 1991 letter, Yaroslavsky required that the investigation be conducted "thoroughly and expeditiously" and noted that "[i]f [the allegations] are without merit, then they should be laid to rest at once." Decls., Ex. C at 45. Also, in her June 5, 1991 memorandum to Chief Gates, Lomax requested that "a progress report be presented ... on June 25, 1991, and that the final report be completed as early as possible in July, 1991." Lomax Decl., Ex. C. In fact, the investigation was officially closed on November 26, 1991—less than six months following its commencement. Given the relatively short duration of the investigation, it is unlikely that the government action at issue created either the reality or the appearance of on-going government interference in ·church affairs. *See Hanna Boys,* 940 F.2d at 1304 (finding no entanglement where National Labor Relations Board jurisdiction over church-owned school required government involvement only with respect to specific charges filed on behalf of employees and where there was no continuing or systematic monitoring of church activities).

Vernon cites two cases finding entanglement in situations he asserts were similar. In *Surinach v. Pesquera de Busquets,* 604 F.2d 73 (1st Cir.1979), the First Circuit found that the Puerto Rico Department of Consumer Affairs violated the Establishment Clause when it subpoenaed documents of the Roman Catholic Church in order to investigate the operating costs of parochial schools and the inflationary spiral reflected in the costs of private education in Puerto Rico. The court concluded that the acts of the Department constituted an impermissible entanglement of the affairs of church and state. *Surinach* is distinguishable from this case because the Department exercised "untrammelled" investigatory powers much broader than those of the city in this case. Moreover, the statute

authorized the Department to establish and inspect price control over all goods and services for consumer use and consumption, suggesting that the government program had the "self-perpetuating and self-expanding propensities" which have traditionally alerted courts to an increased danger of an unconstitutional degree of entanglement. *Id.* at 78 (quoting *Lemon,* 403 U.S. at 624, 91 S.Ct. at 2116–17). Because the government action in this case lacks the on-going regulatory potential of that in *Surinach,* the First Circuit's reasoning is not persuasive here.

Vernon also cites *Word of Faith World Outreach Ctr. Church, Inc. v. Morales,* 787 F.Supp. 689 (W.D.Tex.1992), *rev'd on other grounds,* 986 F.2d 962 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993), in which the district court relied heavily on the reasoning in *Surinach* and found that the Attorney General's investigation of a church's financial records, documenting revenues and expenditures, launched in response to a television news report concerning alleged illegal activities of the church was unconstitutional because it represented undue entanglement under the Establishment Clause. The court reasoned that because (1) the scope of the investigation was unlimited; (2) the Attorney General would be required to make determinations as to which of the church's pamphlets, advertisements, television broadcasts, sermons, etc. are purely religious and which are secular; and (3) the investigation "could" ultimately give rise to both on-going monitoring activity and injunctive action to ensure compliance, the government action was constitutionally invalid. *Id.* at 702. The government action in this case is distinguishable for at least three reasons: first, its scope was limited; second, it had a justifiable secular purpose; and third, it did not require the government either to make religious versus secular determinations or to engage in on-going monitoring activity.

In *Cammack,* 932 F.2d at 781, the Ninth Circuit noted that the Supreme Court has usually found excessive administrative entanglement in situations involving either state aid to groups affiliated with a religious institution, such as parochial schools, *see, e.g.,*

*Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Levitt v. Committee for Public Educ. & Religious Liberty,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); *Lemon, supra,* or where religious employees and public employees must work closely together, *Aguilar,* 473 U.S. at 412–14, 105 S.Ct. at 3237–39 (program required onsite monitoring of sectarian schools by public authorities and coordinated planning by public and sectarian figures); *Walz v. Tax Commission of New York,* 397 U.S. 664, 674–75, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) ("the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance"). The facts of this case do not conform to any of those patterns. In fact, the plaintiff has presented no evidence at all to suggest that the challenged government action will be ongoing and continuous. While we by no means endorse "witch hunts," serious charges—even if thinly documented—against police officers regarding their on-duty performance must be investigated.

In *Lemon,* the Supreme Court was also concerned about political entanglement, or political divisiveness resulting from government action which divides citizens along political lines. *Lemon,* 403 U.S. at 622–23, 91 S.Ct. at 2115–16; *Aguilar,* 473 U.S. at 414, 105 S.Ct. at 3239. Vernon's reliance on political entanglement to establish the unconstitutionality of the investigation, however, is misplaced.

First, the Supreme Court has never relied on political divisiveness as an independent ground for holding a government practice unconstitutional. *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365. As Justice O'Connor observed in *Lynch:*

> Guessing the potential for political divisiveness inherent in a government practice is simply too speculative an enterprise, in part because the existence of the litigation ... itself may affect the political response to the government practice. Political divisiveness is admittedly an evil addressed by the Establishment Clause. Its existence may be evidence that institutional entan-

glement is excessive or that a government practice is perceived as an endorsement of religion. But the constitutional inquiry should focus ultimately on the character of the government activity that might cause such divisiveness, not on the divisiveness itself. The entanglement prong of the *Lemon* test is properly limited to institutional entanglement. *Id.* at 689 [104 S.Ct. at 1368] (O'Connor, J., concurring). The Ninth Circuit follows this approach. *Cammack,* 932 F.2d at 781 ("Although political divisiveness has been considered in establishment clause cases ..., it has never been relied on 'as an independent ground for holding a government practice unconstitutional.' ").

Second, the political entanglement inquiry seems to be applied mainly in cases involving direct financial subsidies paid to parochial schools or to teachers in parochial schools. *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365; *Mueller v. Allen,* 463 U.S. 388, 403–04 n. 11, 103 S.Ct. 3062, 3071 n. 11 (1983). *See also Aguilar,* 473 U.S. at 429, 105 S.Ct. at 3246–47 (O'Connor, J., dissenting).

Third, there is simply no evidence that the government action in this case has given rise to political divisiveness. While such political divisiveness is certainly possible under the circumstances of this case, Vernon has failed to provide any evidence of it.

Because the government's action satisfies all three prongs of the *Lemon* test, it does not violate the Establishment Clause. Accordingly, we affirm the district court's grant of summary judgment in favor of the defendants on this claim.

2. The No Preference Clause Analysis

In *Okrand v. City of Los Angeles,* 207 Cal.App.3d 566, 254 Cal.Rptr. 913 (1989), the court observed that California courts should not view the *Lemon* test as absolute, but rather " 'as a touchstone with which to identify instances where the objectives of the establishment clause have been compromised.' " 254 Cal.Rptr. at 917 n. 6 (quoting *Johnson v. Huntington Beach Union High Sch. Dist.,* 68 Cal.App.3d 1, 137 Cal.Rptr. 43, 48, *cert. denied,* 434 U.S. 877, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977)). Thus, after finding that

all three prongs of the *Lemon* test were satisfied, the *Okrand* court next considered the No Preference Clause to ascertain "whether the governmental action exhibits a preference for a religion or a religious belief." *Id.*, 207 Cal.App.3d 566, 254 Cal.Rptr. at 921 (citing *Fox*, 587 P.2d at 665).

 An establishment claim that is brought under the California Constitution sometimes requires separate analysis from a claim based on the First Amendment because the California Constitution's No Preference Clause is broader than the First Amendment's Establishment Clause. However, in this case the district court observed that "California establishment doctrine is more expansive than its federal counterpart only insofar as it encompasses more government action which aids religion, not more government action which hinders or stigmatizes religion." Second Am. Order Granting Def.'s Mot. for Summ.J. at 2 n. 1.

We agree. Although the No Preference Clause requires that we also consider whether the government action in this case exhibited a preference for a religion or religious belief, Vernon has not alleged (and could not allege) any such preference. By contrast, Vernon contends only that the government action unconstitutionally discriminated against or disfavored his religion. Our examination of California case law has revealed no cases in which the No Preference Clause has been interpreted to be more expansive than the federal constitution as regards government action which disfavors religion. Therefore, we conclude that the government's action in this case did not violate the establishment provision or the more expansive No Preference Clause of the California Constitution.

Accordingly, we find no violation of Vernon's state or federal constitutional rights.

### E. *Attorneys' Fees*

 We deny the defendants' request for attorneys' fees pursuant to 42 U.S.C. § 1988. The same standard is applied when analyzing requests for attorneys' fees at both the trial and appellate levels. *See Patton v.*

*County of Kings,* 857 F.2d 1379, 1381 (9th Cir.1988).

 The authorization of an award of attorneys' fees under 42 U.S.C. § 1988 applies differently to prevailing defendants than to prevailing plaintiffs. Plaintiffs prevailing in a civil rights action should ordinarily recover attorneys' fees unless special circumstances would render such an award "unjust." However, a prevailing defendant should not routinely be awarded attorneys' fees simply because he has succeeded, but rather only where the action is found to be "unreasonable, frivolous, meritless, or vexatious." *Roberts v. Spalding,* 783 F.2d 867, 874 (9th Cir.), *cert. denied,* 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 352 (1986) (internal citations omitted). Thus the mere fact that a defendant prevails does not automatically support an award of fees. *Patton,* 857 F.2d at 1381; *Coverdell v. Department of Social & Health Serv.,* 834 F.2d 758, 770 (9th Cir. 1987).

 As noted above, this Court denies a defendant's requests for attorneys' fees unless the action is frivolous, unreasonable, or without foundation. *Coverdell,* 834 F.2d at 770. An appeal is considered frivolous in this Circuit when the result is obvious or the appellant's arguments of error are wholly without merit. *McConnell,* 661 F.2d at 118. Neither the action brought by the plaintiff nor his appeal to this Court can be characterized as frivolous, unreasonable, or without foundation. Accordingly, we deny the attorneys' fees request.

### IV.

### CONCLUSION

For the reasons articulated above, the district court's decision is affirmed.

AFFIRMED.