**Douglas Edward HAHN, by and through his co-guardians, Judith BARTA and Barbara Axline, Plaintiffs,**

v.

**LINN COUNTY, IOWA, Lu Barron, Lumir Dostal, Jr. and James Houser, in their official capacities as members of the Linn County Board of Supervisors, and Discovery Living, Inc., Defendants.**

No. C99–19–MWB.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

March 11, 2002.

Sondra B. Kaska, Iowa City, IA, for Plaintiffs.

Jeffrey L. Clark, Asst. Linn County Atty., Cedar Rapids, IA, for Linn County.

Kelly R. Baier, Bradley & Riley, Cedar Rapids, IA, for Discovery Living.

## MEMORANDUM OPINION ON NON-JURY TRIAL ON THE MERITS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* .................................................... 1053
   A. *The Parties* ................................................. 1054
   B. *Procedural Background* ........................................ 1054

II. *FINDINGS OF FACT* ............................................... 1056

III. *DISCUSSION* ..................................................... 1059
   A. *Effectiveness Of FC As A Means Of Communication* ..................... 1059
      1. *Defendants' objections to the admissibility of plaintiffs' expert witnesses' testimony* ........................................ 1059
      2. *Whether FC is a valid means of communication for Mr. Hahn in particular* ............................................... 1062
   B. *Attorneys' Fees* .............................................. 1064

*IV. CONCLUSION* ................................................ 1065

In this disability discrimination case of first impression, the plaintiffs assert that Douglas Hahn, who suffers from autism, experiences thoughts and ideas that are more complex than is evident from his verbal speech. Mr. Hahn resides in a group home operated by defendant Discovery Living and works in a sheltered workshop operated by defendant Linn County. The plaintiffs believe that Mr. Hahn's autism prevents the effective expression of his thoughts and emotions and does not allow him to fully participate in the services provided by the defendants. The plaintiffs do, however, feel that full participation is possible and believe that Mr. Hahn is capable of expressing his unspoken thoughts by means of a controversial technique, known as facilitated communication.[1]

This lawsuit arose out of the defendants' refusal to fund this technique—a decision that was based on their belief in the unproven nature of facilitated communication as a valid method of expression as well as a concern over later-discredited allegations of abuse supposedly expressed via facilitated communication. The plaintiffs argue that the defendants' refusal to provide facilitated communication violates both federal and state law because it deprives Douglas Hahn of meaningful access to the services provided by the defendants. Facilitated communication proponents believe that the technique is legitimate and assert that it unleashes unexpected literacy, pointing to individuals who were once diagnosed as mentally retarded but now,

through the use of facilitated communication, attend college. Proponents extol facilitated communication as the key to unlocking the wordless prison in which many autistic individuals are trapped, while critics and skeptics condemn the technique as nothing more than quackery.

The parties in this matter have encouraged the court to reach the broad, global issue of the validity of facilitated communication. And while the bench trial in this matter witnessed an enviable battle of the experts, the experts' testimony ultimately had no effect on the outcome of this case. This case does not require the court to serve as a referee and to determine whether facilitated communication is a legitimate means of communication, because this case turns on one individual's ability to communicate through the use of facilitated communication, and not on the virtues of facilitated communication movement in general.

### I. INTRODUCTION

The plaintiffs in this case are Douglas Edward Hahn ("Mr.Hahn") and his co-guardians/sisters, Judith Barta ("Ms.Barta") and Barbara Axline ("Ms.Axline"). Ms. Barta and Ms. Axline brought this suit on behalf of their brother, Mr. Hahn, against Linn County, Iowa, Lumir Dostal, Jr., James Houser, Lu Barron, in their official capacities as members of the Linn County Board of Supervisors (hereinafter collectively referred to as "Linn County") and Discovery Living, Inc. ("Discovery Living"). The causes of action alleged in the plaintiffs' complaint arise under Sec-

---

**1.** Generally stated, *facilitated communication* is a training technique by which a facilitator provides [varying levels of] physical and other supports to assist a person who has a significant communication disorder to point to objects, pictures, printed letters and words, or to a keyboard in order for the facilitated communication user to communicate his or her

thoughts more effectively. The supports provide resistance and/or stability, which is gradually withdrawn over time.

(Ptlf's Exh. 5) (Donald N. Cardinal, *et al., Investigation of Authorship in Facilitated Communication*, MENTAL RETARDATION, Aug. 1996, at 231, 231) (internal citations omitted).

tion 504 of the Rehabilitation Act of 1973 ("RA"), Title II (public services provided by governmental entities), and Title III (public accommodations furnished by private entities) of the Americans with Disabilities Act of 1990 ("ADA"), and Chapter 216 of the Iowa Civil Rights Act ("ICRA").

### A. The Parties

Mr. Hahn is currently fifty-six and suffers from autism and has been diagnosed with mild cognitive disabilities. Ms. Barta and Ms. Axline are his legal guardians, and the court was impressed by their extraordinary concern for Mr. Hahn's wellbeing. Linn County is a local governmental unit that operates, through the Linn County Department of Human Resources Management, Options of Linn County ("Options"). Options is a sheltered workshop for persons with disabilities. Lumir Dostal, Jr., James Houser, and Lu Barron are members of the Linn County Board of Supervisors and are sued in their official capacities. One of the Board of Supervisors's duties is to oversee the county's programs, including Options, and to ensure that they are in compliance with state and federal law. Discovery Living is a private, not-for-profit corporation that contracts with Linn County to provide residential support services to persons with disabilities. Namely, Discovery Living owns and manages supported living homes for persons with disabilities.

### B. Procedural Background

This case was first filed in this court on January 29, 1999. Prior to the commence-ment of litigation, however, the parties engaged in a three step dispute resolution process, beginning in 1997, which culminated in an appeal by Mr. Hahn to the Linn County Board of Supervisors. The Board unanimously voted to deny Mr. Hahn's request that county personnel participate with him as FC facilitators or that FC be provided as a county-funded service, and, as a result of this decision, the plaintiffs filed suit. The plaintiffs contend that FC is Mr. Hahn's preferred and most effective mode of communication, and by not providing him with FC, the defendants are depriving Mr. Hahn of the ability to engage in meaningful communication with the persons with whom he lives and works, in violation of the RA, the ADA, and the ICRA.

Specifically, in their complaint, plaintiffs alleged twenty-two counts of discrimination. The essence of Mr. Hahn's claims are as follows. First, Mr. Hahn alleges that Linn County violated Title II of the ADA, which provides:

> Subject to the provisions of this subchapter [42 U.S.C. §§ 12131–12165], no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[2] The plaintiffs contend that Linn County violated Title II by (1) failing to provide Mr. Hahn with effective communication—in other words, by failing

---

**2.** In the court's ruling on the defendants' motions for summary judgment, the court made clear that Title II "applies to Mr. Hahn's claims against Linn County and *not* to his claims against Discovery Living." *Hahn,* 130 F.Supp.2d at 1043 (emphasis added). As a private entity, Title III of the ADA governs Discovery Living's services. In their posttrial brief, the plaintiffs contend that Discovery Living must comply with the more stringent requirement of Title II, even though Title II does not apply to Discovery Living, because

of the close contractual nature between Discovery Living and Linn County, a public entity which is subject to Title II.

The court addressed this very argument in its ruling on the defendants' motions for summary judgment. *See id.* at 1059. The court explained that a contractual relationship between a public and a private entity may obligate the public entity to ensure that the private entities with which it contracts comply with the public entity's Title II obligations. *Id.*

to provide FC services; (2) by refusing to modify its policy and practice of "forbidding" the use of FC; and (3) by discriminating against Mr. Hahn based on the type and severity of his disabilities when Linn County determined it needed to establish policies for the use of FC before its implementation. Plaintiffs further contend that modification of Linn County's FC policy would not cause an undo financial burden nor would it be fiscally irresponsible.

Title III, which applies to the plaintiffs claims against Discovery Living, provides, in pertinent part, the following: "No individual shall be discriminated against on the basis of disability in the full and equal

enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).[3]

Plaintiffs allege that Discovery Living violated Title III of the ADA by: (1) requiring that Mr. Hahn pass a literacy test before using FC; (2) refusing to modify its policy of not providing FC; and (3) failing to provide Mr. Hahn with "effective communication" within the meaning of the ADA.

On August 11, 2000, Linn County filed a motion for summary judgment. In its mo-

Discovery Living, however, misconstrued the plaintiffs' argument presented in their post-trial brief, which asserted that Discovery Living must comply with the requirements of Title II. Discovery Living objects, stating that "Plaintiffs for the first time allege that Discovery Living is bound by the requirements of Title II of the ADA. No discovery was conducted regarding this issue and no evidence was presented at trial regarding this issue. Discovery Living received no notice of this allegation, and has not been given an adequate opportunity to defend against the allegation. Because this allegation has not been pled or litigated, it must be dismissed. See St. Paul Reinsurance Co. Ltd. v. Commercial Financial Corp., 144 F.Supp.2d 1057 (N.D.Iowa 2001)." Discovery Living Post–Trial Br., at 27.

The court reads plaintiffs' argument not as contending that Discovery Living may be held liable for failure to comply with Title II, but rather as an argument that, because of the contractual relationship between the defendants, Linn County had a duty to ensure that Discovery Living was abiding by Linn County's Title II requirements. Thus, the end result would be that both parties' services comply with the more stringent demands of Title II, even though Discovery Living is not itself subject to that provision of the ADA.

The portion of plaintiffs' post-trial brief under the heading "Both Defendants Must Comply with the Requirements of Titles II and III of the ADA" is most properly read as plaintiffs' contention that Linn County had an obli-

gation "to ensure that its contracts are carried out in accordance with Title II," and not that, by reason of their contractual relationship, Discovery Living became subject to Title II. See Title II Technical Assistance Manual ("Manual"), 42 U.S.C. § 12206(c)(3), Part II—1.3000. That reading of plaintiffs' argument is erroneous, because such an interpretation would contravene the plain language of the statute, which provides that only public entities are subject to Title II. See id. § 12132. Because the court does not read plaintiffs' argument as an attempt to hold Discovery Living liable for any failure to comply with Title II, the court need not address Discovery Living's objection to this claim.

3. Title III of the ADA applies to "places of public accommodation." See 42 U.S.C. § 12182(a). The implementing regulations, in turn, define a place of public accommodation as "a facility, operated by a private entity, whose operations affect commerce and fall within at least one of the following categories—... (11) A day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment.... 28 C.F.R. § 36.104." The home operated by Discovery Living is akin to a social service center establishment; moreover, the parties do not dispute that Discovery Living is indeed subject to the provisions of Title III. See Hahn, 130 F.Supp.2d at 1054 ("[T]here is no dispute that ... for purposes of the ADA, Discovery Living is a private entity providing public accommodations.").

tion, Linn County alleged the following: (1) that the RA and the ADA cannot be invoked when the benefit denied (here, FC) is not part of the program or activity offered; (2) that Mr. Hahn cannot maintain a "meaningful access" argument without some showing that FC is required; (3) that the RA and the ADA cannot be invoked when there is no showing that the alleged discrimination occurred "solely on the basis of plaintiff's disability"; (4) that Linn County's administration of its Mental Health and Developmental Disability ("MHDD") services complies with the implementing regulation of the ADA; and (5) that Linn County's refusal to fund FC services does not violate Chapter 216 of the ICRA.

On August 14, 2000, Discovery Living filed its motion for summary judgment, arguing the following: (1) that Discovery Living's refusal to provide professionally disapproved services to Mr. Hahn does not constitute an adverse action based upon Mr. Hahn's disability; (2) that Discovery Living's refusal to provide FC does not constitute a denial of equal access to services; (3) that Discovery Living's refusal to provide scientifically-challenged FC services was not a denial of reasonable accommodations; (4) that Discovery Living's imposition of a literacy test did not impose improper criteria; (5) that Discovery Living's refusal to provide FC services is not a denial of a required auxiliary aid; and (6) that Discovery Living's refusal to provide FC services does not violate the ICRA.

On February 2, 2001, the court denied the defendants' motions for summary judgment, finding the plaintiffs generated genuine issues of material fact. After considerable scheduling difficulties, this case was tried before the undersigned on May 7–9, 2001. A final day of this bench trial was held on August 23, 2001 via videotaped deposition. All parties submitted extensive and thorough post-trial briefs. The plaintiffs were represented by Sondra B. Kaska of Iowa City, Iowa. Defendant Linn County was represented by Assistant Linn County Attorney, Jeffrey L. Clark of Cedar Rapids, Iowa. And, defendant Discovery Living was represented by Kelly R. Baier of Bradley & Riley, Cedar Rapids, Iowa. The court finds that the matter has been fully submitted and is now before the court for final disposition.

## II. FINDINGS OF FACT

Mr. Hahn is diagnosed with autism and mild mental retardation ("MR"). Autism is, most simply, described as a developmental disability, which is most often diagnosed by the presence of its symptoms. Autism manifests itself differently in different people, but the most common symptoms, or characteristics, of autism are deficits in social, living, and communication skills. In Mr. Hahn's case, his communication is hindered by echolalic speech, perseveration, and an inhibition in initiating conversations, especially when in unfamiliar surroundings. Echolalic speech is when an individual essentially echoes what has been said to him. For instance, Ms. Barta provided an illustration of Mr. Hahn's echolalic tendencies: if she were to ask Mr. Hahn whether he wanted to go for ice cream or a boat ride, Mr. Hahn might say "Go for ice cream and boat ride" instead of answering Ms. Barta's question. (Tr. at 14, ll. 2–4). Perseveration is the repetition of a particular response, such as a word, phrase, or gesture, despite the cessation of the initial stimulus. Despite Mr. Hahn's echolalia and perseveration, however, Mr. Hahn functions well in structured environments and is able to communicate his wants and needs. Ms. Barta and staff who work with Mr. Hahn on a regular basis at Options and at Discovery Living consistently testified at trial that they were able to understand Mr. Hahn's speech and became accustomed to his echolalia and perseveration.

Nevertheless, it is indisputable that Mr. Hahn's speech is not ideal. In 1990, St. Luke's Hospital performed an evaluation of Mr. Hahn. (Exh. LC–B).[4] St. Luke's conclusions were similar to those found in Mr. Hahn's Annual Report by the Woodward State Hospital–School in 1987. (Exh. LC–A). The St. Luke's report concluded the following with respect to Mr. Hahn's expressive language:

*CONCLUSIONS:*

Doug's receptive language abilities appear to resemble the two year five month to three year five month level of development.

Doug's expressive vocabulary skills resembled the three year eleven month level of development. Doug engaged in echolalia and self-couching through today's testing.

Normal speech reception thresholds were obtained.

*PROGNOSIS:*

Doug appears to be functioning fairly well within a structured environment. Given the diagnosis of mental retardation and autism, prognosis for improvement in his level of speech and language skill is poor.

(Exh. LC–B, at 8).

Mr. Hahn is able to perform daily living tasks fairly well, albeit with supervision. He dresses himself (including the closure of buttons and zippers), uses the telephone (with assistance in dialing), packs his lunch (with oral prompts), and feeds himself (properly using utensils). From the age of twelve until 1987, Mr. Hahn resided at the Woodward State Hospital–School in Woodward, Iowa. In 1987, an opening at Discovery Living in Cedar Rapids, Iowa became available, and Mr. Hahn's family decided that a residential setting would be more beneficial for him. Since 1987, Mr. Hahn has resided in a community-based waiver home, operated by Discovery Living. Mr. Hahn lives with two house-mates, who are also developmentally disabled. At least one Discovery Living staff member supervises the home and ensures that the residents' needs are being met. The supervisor assists the consumers with daily living skills, such as meal preparation, cleaning, laundry, and personal hygiene. Mr. Hahn's home environment is deliberately very structured, and he has formed close relationships with the supervisors of his house.

During the day, Mr. Hahn attends Options, where he works with other people who also have disabilities in a supervised workshop setting. Private companies contract with Options and out-source work to Options that Options consumers are able to perform. At Options, Mr. Hahn works in "area E," and his duties consist of either arranging souvenir pens, sorting boxes, or assembling latch kits. Mr. Hahn works full-time, from approximately 9:00 a.m. until 2:30 p.m. He enjoys the time he spends at Options, although he does not frequently interact with his peers, preferring instead to socialize with his supervisors.

In August of 1993, the staff at Options introduced Mr. Hahn to facilitated communication ("FC") and used FC with Mr. Hahn in his work setting at Options until November of 1993. At that same time, the staff at Discovery Living also began to use FC with Mr. Hahn in his home. "Facilitated communication (FC) is a process by which a 'facilitator' supports the hand or arm of a communicatively impaired individual while using a keyboard or typing device." *American Academy of Child & Adolescent Psychiatry,* AACAP Newsletter, Jan.-Feb.1994 (Exh. LC–D).

**4.** Cites to Linn County's exhibits will be preceded by the abbreviation, "LC." Similarly, "DL" will precede citations to Discovery Living's exhibits.

Karen Kray, a program manager at Options, introduced FC to Mr. Hahn. Ms. Kray herself was first introduced to FC in June of 1993 by a new Options consumer who had been using FC at her high school with a speech-language pathologist. The consumer was graduating from high school and was going to begin work at Options. Because the consumer wanted to continue with FC at Options, Ms. Kray received a limited amount of training from the high school's speech-language pathologist—the training consisted of a one-half to one hour session with the pathologist. (Tr. at 479).

After her training, Ms. Kray began using FC with two autistic consumers at Options, one of whom was Mr. Hahn. (Tr. at 479–80). In addition, Ms. Kray demonstrated the technique to at least three other Options staff members, who also began using FC with their autistic consumers. At this point, in June through September of 1993, Ms. Kray was extremely optimistic about the promises offered to Mr. Hahn. Despite having initiated the use of FC, however, Linn County decided to cease using FC with its Options clients in October of 1993. Similarly, because Discovery Living contracts with Linn County, Discovery Living also ceased using FC with its clients. Linn County's decision to cease using FC was motivated by several factors, including the lack of research validating FC, as well as surfacing concerns over allegations of sexual abuse by means of FC. For approximately one year, Linn County continued to research FC and tried to develop and implement a policy that would allow it to resume using FC. Ultimately, however, Linn County never resumed using FC.

Linn County's cessation of using FC generated numerous complaints raised by Mr. Hahn's legal guardians on his behalf. Mr. Hahn and his legal guardians repeatedly endeavored to persuade Linn County to resume using FC, because they believe that FC is the most effective mode of communication for Mr. Hahn. At the present time, however, Linn County and Discovery Living do not use FC to communicate with Mr. Hahn. They do, however, remain open to the possibility of using FC as a communicative device if and when it is scientifically validated.

Because of the questions surrounding the legitimacy of FC, Discovery Living requested that Mr. Hahn pass a literacy test before reinstating the use of FC. Discovery Living reasoned that, as a matter of common sense, without a minimal level of literacy, any debate on the validity of FC was pointless, because if Mr. Hahn could not write, his output could not be his alone. Ms. Barta testified that she did not know whether Mr. Hahn has had any formal education, and she did not know what type of education, if any, Mr. Hahn may have received during his thirty years at Woodward State Hospital–School. Ms. Barta agreed to a literacy assessment and engaged the services of Jean Beisler, a Speech Language Pathologist for the Early Childhood team at Grant Wood Area Education Agency in Coralville, Iowa. Ms. Beisler provided significant input with regard to how to assess Mr. Hahn's literacy. However, because Ms. Beisler was a paid consultant, retained by Ms. Barta in her attempts to convince Linn County and Discovery Living to use FC with Mr. Hahn, Discovery Living determined that a neutral party would be better situated to assess Mr. Hahn's literacy. Ms. Beisler believes that FC is an effective means of communication for Mr. Hahn and supported Ms. Barta's efforts to change Discovery Living's and Options's stance on the technique. The parties eventually agreed on employing Dr. Jane Cerhan, a neuropsychologist with Marchman Psychology Associates, to develop a literacy assessment tailored to Mr. Hahn's situation. The purpose of the assessment was

not to obtain a reading level, but rather to establish whether Mr. Hahn possessed any reading capacity at all. The parties integrated many of Ms. Beisler's and Ms. Barta's suggestions throughout the test process, but Mr. Hahn ultimately refused to take the assessment. Discovery Living has not continued to explore FC since the cessation of the literacy assessment process. Ms. Barta, however, went so far as to obtain instruction in facilitation, and to this day, she continues to use FC with her brother when he visits her home. In addition, neither Linn County nor Discovery Living has banned the use of FC in their facilities; the defendants merely refuse to fund FC. Thus, Ms. Barta is free to facilitate with Mr. Hahn at both Discovery Living and Options, but neither defendant will fund facilitation with the use of its staff.

### III. DISCUSSION

While the parties raised numerous issues in their post-trial briefs, this case turns on the key factual finding of whether FC is a valid means of communication for Mr. Hahn. There is no need to reach the subsidiary issues without first addressing whether Mr. Hahn communicates through FC because the validity with respect to Mr. Hahn is a prerequisite to any of the parties' permutations bearing fruit. In other words, the court must first determine whether Mr. Hahn communicates through facilitated communication because any failure on the part of the plaintiffs to carry their burden of proof on this point renders unnecessary reaching the other issues.

### A. Effectiveness Of FC As A Means Of Communication

#### 1. Defendants' objections to the admissibility of plaintiffs' expert witnesses' testimony

Prior to trial, the defendants jointly filed a motion *in limine* to exclude the testimony of the plaintiffs' expert, Dr. Douglas Biklen. (Doc. No. 60). The court overruled that motion without prejudice as untimely, (Doc. No. 63), and the defendants renewed their objection at trial. In making their *Daubert* objection as to both of plaintiffs' expert witnesses, Dr. Biklen and Dr. Christopher Kleiwer, the defendants contend that these witnesses lack the expertise, scientific support, and personal knowledge necessary to testify in this case. Specifically, Discovery Living argues that (1) Dr. Biklen's testimony and Dr. Kleiwer's testimony is inadmissable because the witnesses "advance[ ] an opinion about the effectiveness of facilitated communication that is disproven [sic] by the vast weight of scientific studies" and, therefore, lacks a reliable scientific foundation; (2) as professors of special education, neither witness is qualified to provide a scientific opinion on experimental forms of communication for autistic individuals; and (3) both witnesses' "trial testimony presented only speculative conjecture about the personal abilities and needs of Douglas Hahn, unsupported by any personal examination or scientific methodology, which is inadmissible in light of *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir.), *cert. denied,* 531 U.S. 979, 121 S.Ct. 428, 148 L.Ed.2d 436 (2000)." (DL–Br., at 28, 37). While Linn County does not specify its particular objections to Dr. Biklen's testimony in its post-trial brief, it appears from Linn County's argument that its contention is similar to Discovery Living's third argument, *i.e.*, that plaintiffs' experts are unqualified to testify as to Mr. Hahn's ability to use FC. The plaintiffs, of course, disagree and argue that, although the field of disability services is a "soft science," Dr. Biklen's and Dr. Kleiwer's testimony is not only incredibly relevant, but also reliable.

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Thus, under Federal Rule of Evidence 702, expert testimony is admissible *when it will assist the trier of fact. Id.; see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (concluding that the germane inquiry when determining admissibility of expert testimony is whether the testimony would assist the factfinder's understanding of the evidence). " '*Daubert* makes clear that the district court must 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *J.B. Hunt Transport, Inc. v. General Motors Corp.,* 243 F.3d 441, 444 (8th Cir.2001) (quoting *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786) (alteration provided by Eighth Circuit). That is so because, absent some indicia of reliability and relevance to the case before the trier of fact, the testimony cannot "assist" the factfinder, as required by Rule 702. *See* Fed. R. Evid. 702.

In this case, both parties' experts testified primarily as to the validity of FC in general as an effective means of communication for autistic individuals. While the vast majority of research conducted in the area of FC is heavily weighted in favor of the defendants' position, the court need not reach this broad issue, because the court finds that it is not an effective means of communication *for Mr. Hahn.* Therefore, while both sides present intriguing arguments, the court need not address,

nor has it considered, either Dr. Biklen's or Dr. Kliewer's testimony with respect to the general validity of FC. Therefore, to the extent the defendants objected to the admission of the plaintiffs' expert testimony on the broad issue of whether FC is valid, the court will overrule the defendants' objection as moot.

However, both Dr. Biklen and Dr. Kliewer testified that FC was an effective means of communication for Mr. Hahn. This testimony bears directly on the pivotal issue in this case, and the defendants object to the admissibility of this testimony on the ground the plaintiffs' expert witnesses lack a foundation upon which to base this conclusion because neither expert's testimony was based on an evaluation of Mr. Hahn. In *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039 (8th Cir.2000), the Eighth Circuit Court of Appeals addressed the issue of the admissibility of expert testimony. In *Brunswick,* the plaintiffs brought an anti-trust action against a stern drive engine manufacturer, alleging violations of both the Sherman Act and the Clayton Act. *Id.* at 1043. The plaintiffs presented the expert testimony of Dr. Robert Hall, who hypothesized the price of stern engines in a totally free market. *Id.* at 1046. Dr. Hall concluded that the defendant's marketing strategies were anticompetitive, and the jury returned a verdict in favor of the plaintiffs. *Id.* at 1047. The defendant moved for judgment as a matter of law, arguing, *inter alia,* that Dr. Hall's testimony should have been excluded "because his opinion had no basis in the economic reality of the stern drive engine market." *Id.* at 1048. Namely, Dr. Hall's methodology failed to distinguish between lawful and unlawful market behavior. *Id.* at 1055.

The district court rejected the defendant's argument, but, on appeal, the Eighth Circuit reversed, holding that "[a]n

expert opinion cannot sustain a jury's verdict when it 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable....' " *Id.* at 1057 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)) (citing *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1108 (8th Cir.1996) (motion for judgment should have been granted because the expert opinion on causation was speculative)). The appellate court reasoned that "[b]ecause of the deficiencies in the foundation of the opinion, the expert's resulting conclusions were 'mere speculation.' " *Id.* (citing *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 69 F.Supp.2d 571, 580 (S.D.N.Y.1999) (summary judgment appropriate on Section 1 and 2 [of the Sherman Act] claims because "an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case")). The "deficiencies" referenced by the Eighth Circuit were comprised of Dr. Hall's failure to incorporate all relevant circumstances into his method of analysis. *Id.* at 1056. Namely,

Dr. Hall's opinion that Brunswick's [the defendant's] discount programs imposed a tax on boat builders who chose to purchase engines from other manufacturers is not supported by the evidence that some boat builders chose to purchase 100% of their engines from Brunswick when they only needed to purchase 80% to qualify for the maximum discount. If Brunswick's market share had enabled it to charge supracompetitive high prices for its engines, presumably none of the boat builders would have chosen to purchase more than the minimum percentage required to receive the discount. There was other evidence that the boat builders were not unable to forgo Brunswick's discounts. For example, the boat builders wielded sufficient power over Brunswick to force it to scuttle its 1994 "Industry Growth Program," which would have raised the market share requirement to 95%, and their reaction led to a reduction in market share levels for the 1995 to 1997 model year program.

Dr. Hall used the Cournot model to construct a hypothetical market which was not grounded in the economic reality of the stern drive engine market, for it ignored inconvenient evidence. The basis for his model was a theoretical situation in which some other manufacturer's engine would be viewed as equal in quality to Brunswick's. *See* Tr. at 1351. In this hypothetical market, Dr. Hall assessed an overcharge on each engine sold at any point where Brunswick possessed over the 50% market share he deemed permissible. The overcharge was described as the difference between the actual price paid by the boat builders and the price that would theoretically have existed in a more competitive market. This approach was not affected by the actual price at which Brunswick's engines were sold since the overcharge percentage was applied any time its market share surpassed 50%. As Dr. Hall testified but his opinion did not reflect, Brunswick had achieved a 75% share in the mid 1980s, *before* it started the market share discounts and *before* it acquired Bayliner and Sea Ray [boat manufacturing companies]. *See* Tr. at 1392.

The model also failed to account for market events that both sides agreed were not related to any anticompetitive conduct, such as the recall of OMC's Cobra engine [a Brunswick competitor] and the problems associated with the Volvo/OMC merger. Dr. Hall admitted on cross examination that such facts

could have been incorporated into his model but that he had not done so[.] *Id.* (footnote omitted).

In this case, Dr. Kleiwer unsuccessfully attempted to facilitate with Mr. Hahn on one occasion, while Dr. Biklen never attempted to facilitate with Mr. Hahn. Dr. Biklen based his opinion that FC was an effective means of communication for Mr. Hahn on his limited observations of Ms. Barta facilitating with Mr. Hahn. While the defendants present a strong argument that, under *Brunswick,* Dr. Biklen's and Dr. Kleiwer's testimony should be excluded because there are serious deficiencies in the foundation of their opinions, the court will assume, without deciding, that their testimony is admissible, because even if their testimony were admissible and considered by this court, as the factfinder, the expert opinions do not overcome the strong evidence in this case that Mr. Hahn is not communicating via FC.

### 2. Whether FC is a valid means of communication for Mr. Hahn in particular

██ At trial, the court, *sua sponte,* requested that Ms. Barta facilitate with Mr. Hahn or any other individual in order to provide a demonstration of the level of support Ms. Barta uses when facilitating with Mr. Hahn. None of the parties objected, and the following day the court and the parties met in chambers, where Ms. Barta facilitated with Mr. Hahn. During this in-court demonstration, Mr. Hahn did not look at the keyboard despite Ms. Barta's prompts. Yet, his responses to Ms. Barta's typed questions were glaringly absent of the kind of typos one would expect when typing without looking at the keyboard and without a "home row" of keys. The plaintiffs' experts agree that an individual must look at the keyboard before there can be any question that the output is authentic. During the demonstration, Mr. Hahn never looked at the keyboard, while

Ms. Barta's eyes never strayed from the keyboard. In addition, from the demonstration, it was clear that Ms. Barta was guiding Mr. Hahn's finger and not merely providing resistance. Her hand was directly under Mr. Hahn's hand and essentially placed Mr. Hahn's finger on the key to be typed. In combination, Mr. Hahn's failure to look at the keyboard and Ms. Barta's direction of Mr. Hahn's finger, compel this court to conclude that the output generated by Mr. Hahn was not genuine, *i.e.,* was not Mr. Hahn's.

One of the main controversies surrounding FC is "whether the communication stems from the individual or the facilitator." (Exh. LC–BB, at 1) (Elliot W. Simon *et al., A Case Study: Follow–Up Assessment of Facilitated Communication,* J. OF AUTISM AND DEVELOPMENTAL DISORDERS, Vol. 26, No. 1, 1996, at 9, 9). While this case does not require the court to assess generally whether FC is valid, the in-court demonstration inescapably leads to the conclusion that, as to Mr. Hahn's use of FC, the content of Mr. Hahn's communication was being determined by the facilitator. The court does not doubt Ms. Barta's sincerity in her belief that she is not influencing Mr. Hahn's generated output, but facilitator influence is oftentimes done unwittingly by well-intentioned and caring facilitators, such as Ms. Barta. (Exh. DL–FF) (Frontline video, *Prisoners of Silence* ).

While the in-court demonstration alone was enough to persuade the court that Mr. Hahn was not communicating through FC, there are other indications in the record that Mr. Hahn's FC output is not his own. Samples of Mr. Hahn's output provide one such example. Even though the record fails to disclose any evidence of formal education, Mr. Hahn's first recorded communications in September of 1993 are complete sentences with few spelling errors.

Ms. Barta claims that Mr. Hahn is literate because, when she and Mr. Hahn facilitate, she does not read the questions to him. Thus, his facilitated responses are based, according to Ms. Barta, on Mr. Hahn's ability to read the questions. However, because the court finds that Mr. Hahn's output is not his own, the court likewise is not persuaded that this demonstrates literacy. Further, while Ms. Barta conducted her own literacy test with Mr. Hahn, (Pltf's Exh. 26), the court does not find that these tests demonstrate literacy because of the format in which they were conducted[5] and because the court, as the factfinder, does not find that Ms. Barta's test overcomes the professional evaluations performed on Mr. Hahn, which do not indicate literacy.

In addition, Karen Kray facilitated the following communications with Mr. Hahn in September of 1993 shortly before Options discontinued its support of FC:

THIS IS CALLED FACILITATED COOMMUNICATION.
MY NAME E IS DOUGLAS HAHN.
I AM GLAD TO BE USIIIIIIIIIIIING FACILITATED COOMUNICATION. I WILL BE ABLE TO TALK TO OTHERS NOW.
MY MOMS NAME IS DOROTHY HAHN. MY SIISTERS NAMES ARRE JUDI BARTA AND DOROTHY AXLINE.
MY FAVORITE KIND OF POP IS PEPSI.
I LIKE USING THE C/COMPUTER BETTER THAN HE LETTER-

BOARD. MY FAMILY WILL BE SO PROUD THAT I CAN DO THIS. I WA ANT FOR THEM TO GET ME A COMPUTERR SO THAT I CAN TALK TO OTHERS. MIGHT I BE ABLE TO DO THIS MORE WITH YOU.
KAREN KRAY. IT DOESNT BOTHER ME THAT YOU HOLD MY JAND. J SL HLAD THDU U9U CHG HDN9JNG ME TO FACILITATE.

(Exh. LC–C, at 1). Ms. Kray no longer believes that her facilitation with Mr. Hahn was Mr. Hahn's output, but rather she concurs that he did not author those communications. (Tr., at 492, ll. 7–19).

In addition, when Mr. Hahn was asked how he was able to type without looking at the keyboard, his "response" in September of 1993 was, "I ZAM ABLE TO SPELL WITHOUT LOOKING AT THE KEYS BY HZAVING A PICT URE OF THE KEYBOARD IN MY MIND." (Exh. LC–C, at 3). Again, the plaintiffs' experts concede that this is not possible. Therefore, this response must have been influenced by Mr. Hahn's facilitator, Ms. Kray. While both Dr. Biklen and Dr. Kleiwer posit that autistic individuals oftentimes use their peripheral vision to see the keyboard, the in-court demonstration showed that, even if the experts' explanation were true for some people, Mr. Hahn was neither looking directly at the keyboard nor using his peripheral vision to see the keys.

Generally, regulations require public entities to take "appropriate steps" to ensure that communication with a disabled person

---

**5.** The procedure employed during these reading tests involved the following:

I [Ms. Barta] read one of the phrases out-loud while holding Doug's right hand back so he can't make a choice until I'm done talking. I then ask Doug to point to the phrase I read and let his hand go so he can put his finger independently on a card. As soon as Doug points to a card I then put my hand under his arm and pull his hand back so he can only make one choice.

(Pltf's Exh. 26). The court is not convinced that the procedure utilized during these tests did not involve the type of influence that was shown during the in-court FC demonstration. Moreover, the court finds that, more likely than not, Mr. Hahn's responses were influenced by unintentional physical prompts during the testing process.

is as effective as communication with others. 28 C.F.R. § 35.160(a). Furthermore, "[w]here necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity," a public entity must furnish "appropriate auxiliary aids and services." *Id.* at § 35.160(b)(1). "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." *Id.* at § 35.160(b)(2). Nevertheless, "[t]he auxiliary aid requirement is a flexible one, and [covered entities] can choose among various alternatives as long as *the result is effective communication.*" *Id.* at Pt. 36, App. B (emphasis added).

In light of the court's finding that Mr. Hahn is not communicating through the use of FC, FC is not an effective means of communication for Mr. Hahn in particular; therefore, neither federal nor state law requires the defendants to provide it. While Ms. Barta remains free to facilitate with Mr. Hahn, neither federal nor state law mandates that the defendants fund an ineffective means of communication. That is not to say that, in a different case, another Options or Discovery Living consumer might be one of the few individuals who is able to communicate his or her own thoughts through facilitated communication. The court's task in this case is not to determine whether, under those circumstances, the defendants would be required to provide FC. The court's ruling is limited to Mr. Hahn. There is no need, consequently, to determine the utility or validity of facilitated communication, in general. Finding no violation of the ADA, the RA or the ICRA because the defendants need not provide an ineffective communication technique, the plaintiffs' claims are denied and judgment will be entered in favor of the defendants.

### B. Attorneys' Fees

In their post-trial briefs, Linn County and Discovery Living requested attorneys' fees pursuant to 42 U.S.C. § 12205 and Iowa Code § 216.16(5). The plaintiffs resisted, arguing that "there is no authority for Defendants to make this request." (Pltf's Reply Br., at 20 n. 3).

In order to effectuate congressional policy, federal law provides for an award of attorneys' fees to a prevailing party in civil rights actions:

In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs, and the United States shall be liable for the foregoing the same as a private individual.

42 U.S.C. § 12205.

"Defendants are not automatically entitled to an award of attorney's fees merely because they prevail." *Flowers v. Jefferson Hosp. Ass'n,* 49 F.3d 391, 392 (8th Cir.1995) (citing *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1402 (9th Cir.1994)). In fact, attorneys' fees are generally not recoverable by a prevailing defendant, even if the defendant prevails on the merits of the case. *See Schutts v. Bentley Nevada Corp.,* 966 F.Supp. 1549, 1555–56 (D.Nev.1997) (citing *Vernon,* 27 F.3d at 1402). "A prevailing civil rights defendant may be awarded attorney fees under ... 42 U.S.C. § 12205[ ] only if the plaintiff's claim was frivolous, unreasonable, vexatious or groundless *ab initio,* or if the plaintiff continued to litigate after the claim clearly became so." *Id.* at 1556 (citing *Hughes v. Rowe,* 449 U.S. 5, 14, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)), which quoted *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 54

L.Ed.2d 648 (1978); and also citing *Franceschi v. Schwartz,* 57 F.3d 828, 832 (9th Cir.1995); *Sherman v. Babbitt,* 772 F.2d 1476, 1478 (9th Cir.1985) (permitting trial court to award defendant attorneys' fees where plaintiff's claim is "groundless" or "without foundation"); *see also Flowers,* 49 F.3d at 392 (stating "[a] court may award prevailing defendants attorney's fees ... only if the plaintiff's claim was 'frivolous, unreasonable, or groundless, or ... the plaintiff continued to litigate after it clearly became so'") (quoting *Christiansburg Garment Co.,* 434 U.S. at 422, 98 S.Ct. 694). Similarly, the Iowa Code provides for the recovery of attorneys' fees by a prevailing civil rights defendant "when the court finds that the complainant's action was frivolous." IOWA CODE § 216.16(5).

In order for a prevailing civil rights defendant to recover attorneys' fees, therefore, there is a high standard of proof—the defendant must demonstrate that the plaintiff's claim was frivolous. Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B) and Local Rule 54.2(a), requests for attorneys' fees must be made by motion, and the rules enumerate specific requirements with respect to providing a detailed itemization of amounts claimed. The defendants' request for an award of attorneys' fees in their prayer for relief does not comply with either the local or federal rules. However, the court finds that the plaintiffs' claims were not frivolous and, consequently, will rule on the defendants' request.

This was a close case and by no means a frivolous one. The plaintiffs survived two motions for summary judgment, demonstrating the genuine issues generated by their claims. Further, at no point during the litigation of this case did it become clear that the claims asserted and the issues raised were groundless. Accordingly, the defendants' request for an award of attorneys' fees will be denied.

## IV. CONCLUSION

The court finds that FC is not an effective means of communication for Mr. Hahn because the court, as the fact-finder in this bench trial, concludes that the output generated by Mr. Hahn does not represent Mr. Hahn's thoughts. In other words, the court finds that Mr. Hahn's facilitators, and not Mr. Hahn, author the facilitated communications. Because the court finds FC is not effective for Mr. Hahn, the court finds that the defendants are not required to provide FC. Consequently, the defendants have not violated either federal or state law by refusing to fund FC for Mr. Hahn. Therefore, the court **grants judgment in favor of defendants Linn County and Discovery Living and against the plaintiffs, Douglas Hahn, Judith Barta, and Barbara Axline.**

Moreover, the defendants requested an award of attorneys' fees. Because the court finds that the plaintiffs' claims were not frivolous, the court hereby **denies the defendants' request for attorneys' fees.**

**IT IS SO ORDERED.**