

FILED

Sep 20 2017, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Edward D. D'Arcy, Jr.
Michael J. Progar
Merrillville, Indiana

Sheryl A. Bradtke McNeil
McNeil Kopka Pinkus Dolin & Eads,
LLC
Crown Point, Indiana

ATTORNEY FOR APPELLEE

Mark A. Busby
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

The Hope Source, Max Sigmon, Julie Brant Gordon, and Dr. Momi Yamanaka,

*Appellants-Defendants,*

v.

B.T., by his mother and next friend, Melissa Troutman,

*Appellee-Plaintiff.*

September 20, 2017

Court of Appeals Case No.
49A02-1607-CT-1656

Appeal from the Marion Superior Court.
The Honorable Cynthia J. Ayers, Judge.
Trial Court Case No.
49D04-1411-CT-36677

**Barteau, Senior Judge**

## Statement of the Case

In this interlocutory appeal, we are asked to determine whether testimony obtained by facilitated communication is admissible in evidence. In this case of

first impression in Indiana, we hold that in certain situations it can be. Here, we affirm the trial court's preliminary decision regarding the procedure for determining the admissibility of the contested evidence.

## Facts and Procedural History

[2] B.T. is a minor, non-verbal child with severe autism, who was fourteen years old at the time of the trial court's order. He is unable to verbally communicate intelligibly. When B.T. was twelve years old, he received therapy for his autism through Hope Source, Max Sigmon, Julie Brant Gordon, and Dr. Momi Yamanaka (collectively "Hope Source"). B.T. began typing sentences, via facilitated communication, using a supportive typist, also known as a facilitator, in October 2013.

[3] "Facilitated communication is defined as follows: a method of helping an individual produce typewritten material on a keyboard or communication device with the intention of compensating for difficulties in motor control." Appellants' App. Vol. I, p. 96. "The technique was developed by Rosemary Crossley in Australia in the 1970's and introduced to the United States by Dr. Douglas Biklin in 1989." *Id.* When facilitated communication is initially being used, the communicator typically is supported above or below the wrist by the facilitator. *Id.* The goal is for the facilitator, over time, to move the support further back on the arm or shoulder so that there is less direct contact until there is no contact. *Id.* That technique is known as "fading." *Id.* The facilitator applies backward pressure and centers the communicator after each letter is

typed to prevent the communicator from repeatedly striking the same key, one of the manifestations of behavior also known as perseveration. *Id.* Because facilitated communication is a joint activity, however, there is potential for what is known as "cuing," where the facilitator may knowingly or unknowingly anticipate or in another way assist the communicator in selecting certain letters. *Id.*

[4] B.T. uses an iPad containing an assistive typing program/application that reads each letter and then each word typed by B.T. B.T.'s facilitator stands or sits along his right shoulder holding the shoulder of his shirt. He no longer requires wrist or elbow support during his communications. Prior to the use of facilitated communication, B.T. could not communicate in any typed or written form. Facilitated communication is now the sole method by which B.T. can communicate.

[5] The following allegations were made in the complaint against Hope Source. In November 2013, B.T.'s behavior changed. He expressed via facilitated communication that he did not like to work with his guide at Hope Source, Max Sigmon. After being dropped off one morning, B.T. vomited upon seeing Sigmon approaching him, and B.T.'s mother was called to return to the school to take him home. Thereafter, B.T. began sleeping in his parents' bed every night. At roughly the same time period, B.T.'s music therapist, who had allegedly been told by Julie Gordon, President of Hope Source, that B.T. "just plays dumb here for us and won't type," advised Melissa that she noticed there was something not quite right with B.T. Appellants' App. Vol. II, p. 13.

[6] B.T. typed to his music therapist that it would be hard to trust her because of "other therapists." *Id.* During an assistive typing session with his mother, she asked B.T. why he did not like working with Sigmon. He responded that he did not want to get in trouble, that Gordon was Sigmon's sister, and that "I don't want to make anyone mad." *Id.* At a meeting with Gordon and Lisa Chandler, Programs Director at Hope Source, B.T.'s mother expressed her concern that B.T. did not like Sigmon and asked that he not be forced to work with him. Gordon informed B.T.'s mother that B.T. was not allowed to decide which staff member he wished to work with and stated that Sigmon would continue to be B.T.'s guide.

[7] During another assisted typing session with his mother, B.T. allegedly typed that he did not like Sigmon. After his mother asked him why, B.T. responded that "he thinks im retarded." *Id.* at 14. B.T. also typed that Sigmon was scary and asked if he was going to get in trouble if he did not want to be around him anymore. B.T. then typed that he did not want to discuss the matter further.

[8] B.T.'s mother resumed the conversation later that evening, however, during which she asked B.T. if Sigmon had ever touched him inappropriately. B.T. is alleged to have typed that Sigmon placed his hand on B.T.'s butt and on his penis on two different occasions during the summer.

[9] Melissa notified Hope Source that B.T. would no longer be attending Hope Source for therapy. B.T.'s parents met with Dr. Yamanaka and shared B.T.'s

statements with her. Yamanaka allegedly stated to Melissa that she took "full responsibility for [B.T.] still working with [Sigmon]." *Id.*

[10] An investigation was conducted by the Indiana Department of Child Services. The complaint was deemed "unsubstantiated" in a report filed on May 19, 2014. *Id.* at 63. The family case manager noted that on numerous occasions during his interview, B.T. would look away from the keyboard while typing with the assistance of his usual supportive typist, who was not his mother.

[11] On November 7, 2014, B.T., by his next friend, his mother, Melissa Troutman, filed a civil lawsuit against Sigmon; his sister, Julie Brant Gordon, President of The Hope Source; Dr. Momi Yamanaka, a licensed psychologist and Clinical Supervisor at The Hope Source; and, The Hope Source.

[12] Hope Source sought to depose B.T. prior to trial. On September 17, 2015, Sigmon filed a motion to bar the use of a facilitator at B.T.'s deposition. The other defendants joined in Sigmon's motion and filed their own motion seeking to bar the use of facilitated communication for the deposition or any future proceedings in the case. B.T. through his mother, Melissa, filed an objection.

[13] On March 23, 2016, the trial court issued an order denying the request to bar the use of facilitated communication during the deposition. Appellants' App. Vol. II, pp. 95-100. The trial court granted Hope Source's petition to certify the decision for interlocutory appeal. A motions panel of this Court accepted jurisdiction of the interlocutory appeal, but, while retaining jurisdiction, remanded the case to the trial court, directing it to hold a hearing pursuant to

Indiana Rule of Evidence 702 to create a record regarding the science surrounding facilitated communication and its admissibility. *Id.* at 108-09.

[14] The trial court scheduled a hearing as ordered by this Court, but the parties and the trial court quickly realized that the time allotted would not be sufficient to provide an adequate record to aid the trial court in issuing its order for review by this Court. A brief enlargement of time was granted by this Court, and, after another hearing, the trial court entered its order finding, in pertinent part, that the science surrounding facilitated communication is largely unsettled. Appellants' App. Vol. III, p. 66. As such, the trial court found that B.T. carried the burden of establishing that he is the one communicating by way of facilitated communication. *Id.* at 67. No testimony was presented at the hearing. Only the argument of counsel was heard based upon briefs prepared for the hearing.

[15] More specifically, the trial court found that a determination of whether the facilitator could "effectively communicate with the witness and reliably convey the witness's answers to the court" lends itself to empirical rather than scientific proof. *Id.* The trial court further held that cases from other jurisdictions suggest that the reliability of facilitated communication should be determined on a case-by-case basis. *Id.*

[16] The trial court concluded, while rejecting cases from other jurisdictions applying evidentiary rules at the outset of the determination, that fact-specific questions could be devised for B.T. which would demonstrate whether the

answers were B.T.'s, or were under even the most subtle of influences by the facilitator. *Id.* If the trial court was convinced that the facilitator was "competent, trained, and skilled in order to honestly and candidly transmit communications, under oath, from B.T. to the court, then the facilitator may be appointed to carry out such a task either at the deposition or at the time of trial." *Id.*

The trial court held that it must be satisfied that the communicated thoughts were those of B.T. and not the facilitator. Otherwise, the statements would not be allowed in evidence. *Id.* at 68. The trial court placed the burden of making the request for holding such a demonstration hearing on the parties. *Id.* This appeal ensued.

## Discussion and Decision

This Court remanded the case to the trial court to issue an order after holding additional hearings. More particularly, the trial court was directed, pursuant to Indiana Rule of Evidence 702, to create a record regarding the science surrounding facilitated communication and its admissibility.

Indiana Evidence Rule 702 provides as follows:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

(b) Expert scientific testimony is admissible only if the court is satisfied that expert testimony rests upon reliable scientific principles.

[20] The parties approach this appeal from different vantage points. Hope Source contends that the trial court erred by denying its request to bar the use of facilitated communication at any stage of the proceedings. Specifically, Hope Source notes that the trial court specifically refused to consider the articles submitted by B.T. and his mother about facilitated communication because there was no proponent for the evidence. As such, the deposition testimony of Dr. Howard Shane, submitted by Hope Source, was uncontroverted and explicitly opined that the validity of facilitated communication was unsettled if not debunked.

[21] Melissa, on behalf of B.T., argues that the trial court has not officially denied Hope Source's position on the reliability of facilitated communication under Indiana Rule of Evidence 702, focusing on the trial court's conclusion that the issue of B.T.'s competency must be demonstrated first by way of facilitated communication before the court would consider the validity or use of facilitated communication for any proceeding.

[22] The trial court's ruling relied on analysis of caselaw from other states as this is a case of first impression in Indiana. We will highlight the rationale used by the various courts in arriving at their determinations to explain our decision here.

[23] In *Matter of D.S.S. v. Mark S.*, 593 N.Y.S.2d 142 (Fam. Ct. 1992), the family court was asked to determine the admissibility of a sixteen-year-old, non-vocal,

autistic child's out-of-court statements concerning alleged abuse by her father. The statements were made by way of facilitated communication. The court was asked to analogize facilitated communication to other forms of communication such as American Sign Language. The court declined to make the analogy, concluding that the *Frye*[1] test applied and the validity of facilitated communication had not been established.

[24] Another early case involving the admissibility of out-of-court statements made through the use of facilitated communication was *Matter of M.Z.*, 590 N.Y.S.2d 390 (Fam. Ct. 1992). At issue were statements made by a ten-year-old partially verbal child with Down's syndrome. A pre-trial hearing was held to determine this issue. The court concluded that there was insufficient evidence that facilitated communication had been generally accepted or was reliable, that there was not enough evidence to show that it could be successfully used by a child with Down's syndrome, and that its use would not be permitted in a fact-finding hearing.

[25] Next, in *People v. Webb*, 597 N.Y.S.2d 565 (County. Ct. 1993), the court considered the admissibility of a child victim's testimony utilizing facilitated communication during a grand jury proceeding. The child suffered difficulty in

---

[1] *Frye v. United States*, 293 F. 103 (D.C. Cir. 1923) (general acceptance test is used to determine the admissibility of scientific evidence), superseded by rule as stated in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (federal rules do not require general acceptance as precondition to admissibility of scientific evidence; rules give trial court the task of ensuring expert's testimony rests on reliable foundation and is relevant).

performing such motor skills as speech. During the grand jury testimony, the facilitator was equipped with headphones through which white noise was produced, making it impossible for the facilitator to hear the questions asked of the child. The facilitator was issued an oath to assist the witness without adding, subtracting, or changing the testimony of the communicator. Unlike in prior cases, the grand jury was able to see the process being used. The court did not find the *Frye* test to be applicable, but noted that it would hold a hearing in limine prior to trial for further information about the technique of facilitated communication.

[26] In *Matter of Luz P.*, 595 N.Y.S.2d 541 (N.Y. App. Div. 1993), the issue was the use of facilitated communication in a child protective services proceeding involving an eleven-year-old, non-verbal, autistic girl, who alleged by this method of communication that her parents were sexually abusing her.

[27] Prior to the fact-finding hearing, the trial court ordered a *Frye* hearing. The trial court dismissed the action after the department of social services requested a continuance to obtain expert witnesses in order to meet the burden placed on the department to establish reliability under *Frye*.

[28] On appeal, the trial court's dismissal was reversed and the matter was remanded to the trial court for further proceedings. The appellate court held that just as there was no need to conduct a *Frye* hearing in order to appoint an interpreter for the child's Spanish-speaking parents, there was no need to conduct such a hearing for the facilitator whose only task was to assist the child

in communicating, not to translate the questions or answers presented to and supplied by the child.

[29]    *Storch v. Syracuse Univ.*, 629 N.Y.S.2d 958 (N.Y. S. Ct. 1995), involves the admissibility of statements allegedly made by a young autistic girl who cannot speak. Through facilitated communication, she claimed to school officials that she had been sexually molested by her father. The girl was removed from her family's care, and the accusation was filed against her father. The family court judge who heard the petition applied the *Frye* test, and determined that facilitated communication was not generally accepted as reliable within the relevant scientific community. The court disallowed the girl's testimony and the petition against the father was withdrawn.[2]

[30]    *State v. Warden*, 891 P.2d 1074 (Kan. 1995), was a direct appeal raising issues about a victim's competency and ability to communicate. The twelve-year-old victim, J.K., was diagnosed with autism and severe or profound mental retardation. In September 1989, J.K. became a resident of the Institute of Logopedics ("IOL"). Prior to his admission at IOL, J.K. was described as being non-verbal and non-expressive, having limited receptive language, and non-responsive to verbal directions. Various testing classified J.K. between the

---

[2] The parents later filed an action against several people involved in the investigation, seeking damages for state and federal rights violations, malicious prosecution, fraud, and malpractice. The matter was ultimately resolved in favor of the defendants on summary judgment.

mental ages of twenty-seven months and five years. However, J.K. was found to have good motor skills.

[31] A speech pathologist at IOL believed that J.K. understood more than he could express, and, after February 2002, when IOL had decided to use facilitated communication with some of its students, the speech pathologist selected J.K. as one of her first students to use this method. While using this method, he disclosed accusations of sexual molestation by the defendant. The defendant confessed his misconduct to a co-worker and to a police officer.

[32] Prior to trial, however, the defendant sought to suppress J.K.'s out-of-court statements made through facilitated communication, and sought to prevent J.K. from testifying in court using that method, arguing that the technique was not generally accepted under *Frye*.

[33] After holding extensive hearings, the trial court ruled that *Frye* did not apply because the issue was whether J.K. was communicating. The trial court found that J.K. was communicating and allowed only the actual letters typed by him to be admitted in evidence. No interpretation of the typed statements was allowed because that might fall within the realm of scientific testimony, making *Frye* applicable.

[34] On appeal, the Kansas Supreme Court noted two propositions that shaped its decision of the appeal. First, the court observed that although facilitated communication has not received unanimous support in the scientific community, each instance of the use of facilitated communication should be

evaluated for validity. Second, one of the premises upon which facilitated communication finds its basis is the assumption that the communicator or speaker is competent.

[35] The court held that "We are not persuaded that statements produced through facilitated communication are scientific evidence subject to the *Frye* test. Facilitated communication is just what its name implies: a method of communication." *Id.* at 1088. The court expressed, however, that when statements made via facilitated communication are admitted at trial, the credibility and weight to be given those statements are issues for the finder of fact. *Id.* Furthermore, testimony challenging the validity of such communication, such as evidence of the technique involved in facilitated communication, its origins, and acceptance within the pertinent scientific community, would be admissible. *Id.*

[36] Since this is a case of first impression in Indiana, it is worth going into additional detail about other facets of the *Warden* court's ruling. Concerning the issue of the protocol involved in selecting the facilitator, the court noted that the admission of evidence, and the manner in which it is received, is left to the discretion of the trial court. *Id.* at 1089. After concluding that no abuse of discretion had been established, the court suggested a better practice for the admission of a witness' in-court testimony via facilitated communication. The court acknowledged the recommendation that if the usual facilitator was used, the court should direct that person to divert their eyes and wear headphones so that the person would not be aware of the questions propounded to the witness

before facilitating responses. *Id.* at 1090. However, the court also noted in that particular case, by the time the request was made, it was too late for the witness to become used to the changes in procedure, which lacked the needed familiarity and predictability for him to be able to communicate. *Id.* Further, the court emphasized that the facilitator should be given an oath to repeat the communicator's responses in English to the best of his or her skill and judgment, and without influencing the responses. *Id.*[3]

[37] Next, with respect to a hearing on the communicator's competency, the trial court was faced with whether J.K. was unavailable under the state's child hearsay statute. The trial court considered the challenge to be one of the competency of the witness.

[38] On appellate review, the court held, after noting the statutory provision regarding the general rule of qualification of witnesses, and the requisite showing for the disqualification of witnesses, that no person should be disqualified based upon a disability. *Id.* at 1093. The court concluded that an evaluation must be conducted on a case-by-case basis to determine the validity of facilitated communication as respects the particular person. *Id.* The facilitator should utilize headphones to avoid hearing the questions propounded to the witness. *Id.* Further, fact-specific questions should be asked to insure the

---

[3] In some cases, the facilitator reads aloud each letter as it is typed. In other cases, the communicator's responses are viewed by the court as they are typed. In any event, the oath defines the role of the facilitator as providing support to the communicator, and not serving as an advocate or interpreter.

answers are not subject to influence or cuing by the facilitator. *Id.* The witness must be sworn, and the facilitator should be appointed and placed under oath. *Id.*

[39] The court held that the burden of establishing the incompetency of the witness rests with the challenging party. *Id.* at 1094. The decision whether the burden has been met lies in the discretion of the trial court. *Id.*

[40] *Hahn ex rel. Barta v. Linn Cty, Iowa*, 191 F. Supp. 1051 (2002), was a case involving allegations of disability discrimination under both state and federal law, challenging the defendants' refusal to fund facilitated communication after unsubstantiated allegations of abuse were communicated by Hahn, an autistic, disabled adult, through this technique, which he learned while working in a supervised setting operated by the county.

[41] Linn County contracted with Discovery Living, a private, not-for-profit corporation, providing residential support services to persons with disabilities, of which Hahn was one. Linn County, through the Linn County Department of Human Resources Management, operated a sheltered workshop facility for persons with disabilities. Hahn participated in that workshop program, called Options of Linn County, and learned to communicate via facilitated communication while working at Options. Linn County, however, decided to cease the use of facilitated communication in the workshop setting, ultimately prompting the lawsuit.

[42] Discovery Living, however remained open to the notion of reinstating the use of facilitated communication with Hahn so long as he could pass a literacy test. The defendants did not ban the use of facilitated communication with Hahn at its facilities, but they remained steadfast in their refusal for funding such a venture. One of Hahn's sisters agreed to the literacy test and employed a speech language pathologist, who provided input about how Hahn's literacy could be assessed. Because the speech language pathologist was a paid consultant by Hahn's sister, Discovery Living argued that the assessment should be made by a neutral party and not that person. A neutral party was agreed upon by the parties and she was given the sole duty of assessing whether Hahn had any reading capacity at all.

[43] The court was encouraged by the parties to rule on the case based on its determination of the validity of facilitated communication. More specifically, the defendants filed a motion in limine to prohibit the admission of Hahn's expert testimony of Dr. Biklen and Dr. Christopher Kleiwer, as lacking expertise, scientific support and personal knowledge relying on a *Daubert* objection. The court determined that the resolution of the case did not depend upon an evaluation of the legitimacy of facilitated communication, finding instead that the case turned on whether Hahn could communicate by using facilitated communication. *Sua sponte*, and without objection by the parties, the trial court requested that Hahn's sister demonstrate facilitated communication with her brother.

[44] During the demonstration in chambers, Hahn did not look at the keyboard while communicating, and his responses lacked the expected typos. The court also found that Hahn's sister was doing more than facilitating communication, instead directing Hahn's finger to specific keys on the keyboard. The court concluded that the communication was not Hahn's and that he had not exhibited any level of literacy.

[45] In our opinion, an assessment of the evolving caselaw in this novel area leads us to the conclusion that there has been a shift from an initial focus on the reliability of the science involved, to an emphasis on the examination of the details of the application of facilitated communication to each specific case.

[46] Turning to the present case, we recite the oft-stated principle that decisions regarding the admissibility of evidence lie within the trial court's discretion. *Hopper v. Carey*, 716 N.E.2d 566, 570 (Ind. Ct. App. 1999). "Even if a trial court errs in a ruling on the admissibility of evidence, we will only reverse if the error is inconsistent with substantial justice." *Id.*

[47] We note that in deciding what procedure should be used to determine the admissibility of B.T.'s testimony, the trial court concluded that it must first decide whether B.T. was the one communicating by use of facilitated communication. Although some cases refer to this decision as one involving literacy, others deem the decision to be one involving competency. *See Hahn*, 191 F. Supp. 1051 (literacy); *Warden*, 891 P.2d 1074 (competency).

[48] Under Indiana Rule of Evidence 601, "Every person is competent to be a witness except as otherwise provided in these rules or by statute." A determination as to a witness's competency lies within the sound discretion of the trial court and is reviewable only for a manifest abuse of that discretion. *Harrington v. State*, 755 N.E.2d 1176, 1181 (Ind. Ct. App. 2001). It is within the sound discretion of the trial court to determine whether a child is competent to testify based upon the court's observation of the child's demeanor and responses to questions posed to him by counsel and the court. *Id.* A trial court's determination that a child is competent will only be reversed for an abuse of discretion. *Id.*

[49] The trial court's thoughtful decision including detailed findings and conclusions, which greatly aided our appellate review, serves as a roadmap for the determination if B.T. is testifying, an opportunity for the defendants to challenge his competency, and, if his testimony is admitted at trial, an opportunity to challenge his credibility by way of evidence challenging facilitated communication as a method of communication. We find no abuse of discretion in the trial court's preliminary ruling on the request to bar the use of facilitated communication.

# Conclusion

[50] In light of the foregoing, we affirm the decision of the trial court.

[51] Affirmed.

Barnes, J., and Altice, J., concur.